Filed 2/27/17

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S089609 |
| v. | ) | |
| | ) | Kings County |
| ANTHONY GILBERT DELGADO, | ) | Super. Ct. No. 99CM7335 |
| | ) | |
| Defendant and Appellant. | ) | |
| _____ | ) | |

Defendant, Anthony Gilbert Delgado, killed two fellow inmates while serving a 25-year-to-life sentence in Corcoran State Prison. A jury convicted him of two counts of first degree murder,[1] with the special circumstances of lying in wait[2] and multiple murders;[3] two counts of assault by a life prisoner with malice aforethought,[4] with findings that the assaults proximately caused the victims' deaths; battery by a prisoner on a correctional officer;[5] and possession of a sharp instrument by a prisoner.[6] It also found he had suffered two prior felony convictions within the meaning of the "Three Strikes" law.[7]

---

[1]	Penal Code sections 187, subdivision (a) and 189. Further undesignated statutory references are to the Penal Code.
[2]	Section 190.2, subdivision (a)(15).
[3]	Section 190.2, subdivision (a)(3).
[4]	Section 4500 (hereafter aggravated assault by a life prisoner).
[5]	Section 4501.5.
[6]	Section 4502, subdivision (a).
[7]	Sections 667, subdivisions (d), (e) and 1170.12.

1

The jury returned a death verdict and the trial court entered a conforming judgment,[8] as well as two consecutive terms of 25 years to life for the battery and weapon possession counts. This appeal is automatic. We affirm the judgment in its entirety.

## I. FACTS

### A. Guilt Phase

#### 1. Murder of Frank Mendoza

On September 30, 1998, defendant and Frank Mendoza shared a cell. Around 11:15 p.m., an officer noted that both men were lying on their bunks watching television. About 25 minutes later, defendant called out, and Officer Carmona went to investigate. He saw Mendoza slumped forward on his knees between the two beds. Defendant calmly walked over to Mendoza, lifted him up by a cloth wrapped around his neck, and dropped him back to the ground. Mendoza had been strangled to death. A pillowcase covered his face, secured by a torn bed sheet. A white sock and second torn sheet were tied around his mouth. Written on the back of Mendoza's T-shirt were the words: "There's consequences to everything. He paid his and I'm to pay mine, too. Toro."

Defendant gave a taped statement about the killing and reenacted the crime. Mendoza had verbally abused defendant and bragged about his prior status as a lieutenant in the Nuestra Familia prison gang. Defendant warned he would "take [Mendoza] out" if he continued this behavior. Mendoza persisted, so defendant decided to kill him. Already serving a life sentence, defendant had nothing more to lose. Defendant "knew exactly when [he] was going to do it." After nighttime

---

[8] The court imposed sentences of death on the murder convictions and the convictions for aggravated assault by a life prisoner, but stayed the latter two sentences pursuant to section 654.

cell check, he covered the overhead light and wedged paper in the cell door to prevent entry.  Mendoza seemed nervous, so defendant watched television to put him at ease.  When the opportunity arose, defendant choked his victim for over four minutes, which he timed.  Mendoza struggled, but eventually defendant could "fe[el] the life come out of him."  Defendant tied a sheet and a sock around his neck, pulling it as tight as he could.  He watched Mendoza for a while to make sure he was dead.  Defendant felt no remorse.  He said Mendoza "had it coming."  He wrote a message on Mendoza's T-shirt and watched more television.  He then removed the paper from the door and alerted the guards.

### 2. *Murder of Kevin Mahoney*

On July 2, 1999, defendant and inmate Kevin Mahoney, Jr., were placed in an exercise yard together.  About two hours later, a security alarm summoned Officer Robert Todd to the yard.  Mahoney was lying facedown in a pool of blood.  He had no pulse or respiration.  There were lacerations and bruises on his face and body, and a subdural hemorrhage at the back of his head.  Two T-shirts were tied around his neck.  A nearby wall bore blood splatters and a "happy face" drawn in blood.  Defendant's feet and legs were covered in blood.  While waiting in a holding cell, defendant told one officer, "You guys gave me Three Strikes on some chicken shit fight, so now I'm going to earn mine.  I got two now, and I got one more to go."

A surveillance tape captured the attack.  When defendant and Mahoney were placed in the yard, they shook hands, then walked and sat separately for several minutes.  Later they walked together.  Approximately 52 minutes after they entered the yard, defendant attacked Mahoney without warning, punching and kicking him repeatedly for about 30 seconds.  After the attack, Mahoney sat on the ground as defendant paced back and forth.  Defendant attacked again about 12

3

minutes later, striking Mahoney several times in the head with a shoe. Mahoney remained seated; defendant continued to pace. A third attack occurred about 27 minutes after the second. Defendant grabbed Mahoney from behind and dragged him into a shadowy corner. He choked his victim for over four minutes, then picked up a T-shirt and tied it around Mahoney's neck. Defendant resumed pacing, repeatedly returning to the body and stomping on it.

Mahoney was strangled to death. His blunt force injuries were consistent with having suffered repeated blows.

Again, defendant gave a taped statement and reenacted the crime. He decided to kill Mahoney as soon as they were put in the yard together, and put him at ease by telling him that he wanted no trouble. Defendant judged Mahoney an "[e]asy" mark. Defendant had planned to lunge at his victim and snap his neck, but he was unable to grip him securely. He resorted to punching and kicking instead. Defendant attacked Mahoney three times "until I was able to get him in a choke hold and drag him off into the corner. And that's where I wanted him." Defendant explained that he moved Mahoney to that location because it would be more difficult for guards to shoot him. He choked the struggling man until he stopped breathing, then tied torn T-shirts around his neck. Defendant could hear Mahoney "gurgling in his [own] blood" which angered him. Intent on "caus[ing] as much injury . . . as I could," he used his foot to repeatedly slam Mahoney's head into the concrete.

Defendant told an investigator, "I did it so what, what can you do to me[?] No one can do nothing to me." As to motive, he said: "I've [*sic*] snapped when . . . they gave me life for that stupid ass shit . . . a little over a[] year and a half ago. When they gave me three strikes for that shit, I told myself, made a deal with the devil, you give me the opportunity man to pick up each murder for each one of those strikes we're cool. So that's . . . my pack [*sic*] with the devil man, I already

4

got two that's my two strikes. I'm gonna . . . earn each and every one of my strikes." He confirmed that he would kill again, saying "I hope there gonna [be] ten or fifteen" more victims. According to defendant, "My whole objective from here to now, now until I die, is to kill and to hurt, to cause as much destruction how[ ]ever, where ever, when ever. And oh as far as I'm concerned I got no more soul and I don't give [a] fuck no more. Nothing else matters to me."

### 3. *Battery of Correctional Officer Erik Mares*

Between the two murders, on October 20, 1998, defendant attacked Correctional Officer Eric Mares. As he was being handcuffed to be taken to the shower, defendant pulled away and ran to the middle of his cell with the handcuff attached to one wrist. Asked what was bothering him, defendant replied, "[T]his conversation's over and I'm taking this to the next level." Several officers assembled for a cell extraction. When they directed pepper spray into the cell, defendant rushed at the door holding his mattress to block the spray. An officer ran in, but slipped immediately because a slick substance covered the floor. A second officer also slipped and fell. Officer Mares managed to enter and grab defendant's legs. Defendant jabbed at Mares several times with a pointed object. Another officer pried the weapon from defendant's grasp. A sharp piece of plastic with a cloth handle was recovered from the cell floor. A second piece of sharpened plastic was found on defendant's bed. Mares had puncture holes in his protective vest and cuts on his shoulder.

Defendant admitted that he "[j]ust got bored," and decided to provoke a cell extraction. He had two weapons ready for the confrontation and put shampoo in front of the cell door so entering officers would lose their footing. He admitted stabbing Officer Mares in the shoulder and trying to get "a nice good solid straight

5

thrust, if I was to get one in the neck or somethin['] like that, it would cause serious injury. [¶] . . . I could get an eye or somethin['].”

### 4. Aggravated Assault by a Life Prisoner

Defendant was convicted of two counts of assault with a deadly weapon in 1994, and was serving a life sentence when the charged crimes occurred.

### B. Penalty Phase

#### 1. Prosecution

The prosecution introduced evidence of 10 incidents between 1997 and 2000 during which defendant possessed various weapons and assaulted correctional officers or another inmate. Several of these incidents are discussed in further detail, *post*, at pages 44-50. Evidence also established defendant was convicted of receiving stolen property in 1986, possession of a weapon by an inmate in 1986, and second degree burglary in 1990.

#### 2. Defense

The youngest of nine children sired by four different fathers, defendant was neglected and abused by his alcoholic mother. As an infant, he was often left crying, soiled, and hungry after his mother passed out. His 11-year-old sister frequently assumed his care. As defendant got older, his mother would tie his hands and lock him in a dark closet for extended periods. She beat him often with a broom or a belt. She sometimes made him kneel on grains of rice, which cut his bare knees. The family had little to eat, but his mother punished him if he accepted food from neighbors.

Defendant's cousin, Inocencio Ortega, recalled defendant's mother beating him and locking him in the closet. Defendant sometimes hid at Ortega's house to escape. Once defendant's older brothers gave him glue to sniff.

6

Defendant was removed from his mother's care at about seven years old. When he was 11, he lived for over a year in a group home. Defendant had scars on his wrists that resembled ligature marks. Slight of build, he was self-protective. He exhibited low self-esteem and would destroy his things when he was upset or frustrated. His fifth grade teacher described him as bright, funny, and trustworthy. He responded well when treated with respect, but had a temper and lacked social skills. He would frequently push and shove other children because he did not know how to communicate. Told his behavior was inappropriate, he improved and became popular with his classmates.

## II. DISCUSSION

### A. Guilt Phase Issues

#### 1. Presence of Correctional Officers During Attorney-Client Communications

After killing Kevin Mahoney, defendant vowed in an interview that he would kill again. (See *ante*, at pp. 4-5.) Concerned for defense counsel's safety, and with her express agreement, the trial court ordered two correctional officers to be present during all attorney-client consultations. They were bound by the attorney-client privilege. Defendant contends that the trial court exceeded its jurisdiction by accepting the parties' stipulation and purporting to extend the attorney-client privilege to the correctional officers, who were unnecessary to the consultation. He criticizes the court for failing to consider alternative arrangements, such as physical restraints, that would have accomplished the same goal without jeopardizing confidentiality. He argues that the court-sanctioned intrusion deprived him of his federal and state constitutional rights to counsel, to present a defense, to be present during all proceedings, and to fundamental due process. He contends that the error was structural and reversible without a showing of prejudice. We reject his claims.

7

### a. Proceedings Below

On August 6, 1999, the court held an in-chambers meeting with the prosecutor and prospective Defense Counsel Donna Tarter. The prosecutor observed that defendant had already killed two people and that he had reason to believe defendant would kill again. Voicing concerns for Tarter's safety, the prosecutor suggested that two correctional officers be present at all attorney-client meetings and that they be bound by the attorney-client privilege as to anything they might overhear. Tartar agreed, and the court made the order to the two correctional officers present. Thereafter, Tartar met privately with defendant and was appointed by the court to represent him. Initially, there was no discussion of the court's order in open court in defendant's presence.

On December 22, 1999, while defendant was present in open court, the prosecutor explained the security arrangements: "any communications that are overheard between Ms. Tarter and Mr. Delgado during any of the court proceeding[s] or when she is visiting him are to be encompassed within the attorney-client privilege. Given the nature of this case, we've personally given that privilege to officers Masters and [Klose] so that they may be present during all communications just for the safety of all parties." Defense counsel stated her agreement, and the trial court expressly admonished the officers "that you're each ordered not to disclose any information you might overhear in any of those conversations to anyone, including family members, coworkers, anyone." Both officers affirmed their understanding. Defendant voiced no objection.

During trial, three correctional officers were stationed near defendant, one on either side and one directly behind. The record is not entirely clear if defendant and defense counsel sat next to each other or if a correctional officer sat between them. Defendant's hands were unrestrained so that he could write notes to counsel. Defense counsel expressly agreed to these security arrangements.

8

From the time he was first arraigned, defendant appeared personally in court approximately 23 times during pretrial and trial proceedings. He never complained to the court about the presence of officers at confidential attorney-client meetings. On April 14 and May 2, 2000, before trial began, the court inquired of defendant personally if there was any reason the trial could not go forward. He stated there was none. Defense counsel likewise answered ready for trial. Periodically thereafter, the court inquired of defense counsel if she had any objections or concerns. She, too, voiced no concern about the presence of officers at attorney-client meetings or in the courtroom.

Here, defendant advances both statutory and constitutional challenges to the court's order.

### b. Attorney-Client Privilege and the Need for the Ordered Security Measures

Citing Evidence Code section 952, defendant argues that the correctional officers' presence destroyed the confidentiality of his attorney-client communications because it was not reasonably necessary to further the purpose of the legal consultation. (See Evid. Code, § 952;[9] *Zurich American Ins. Co. v. Superior Court* (2007) 155 Cal.App.4th 1485, 1503 (*Zurich*).) He reasons that there was no showing of a security risk to defense counsel, and that other measures, such as physical restraints, would have been adequate. He contends that

[9] Evidence Code section 952 defines " 'confidential communication between client and lawyer' " as "information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship."

the parties were not authorized to extend the attorney-client privilege by stipulation, and that the trial court acted in excess of its jurisdiction in accepting the stipulation.

These claims have been forfeited. Defense counsel expressly agreed to the officers' presence at attorney-client meetings to ensure her safety, and both parties stipulated that the officers would be bound by the privilege. In the trial court, neither party challenged the necessity for the measures or the legality of the stipulation. Under these circumstances, defendant may not be heard to argue for the first time on appeal that the arrangement was unnecessary and that the privilege was destroyed. (*Dowling v. Farmers Ins. Exchange* (2012) 208 Cal.App.4th 685, 696-697; see generally *Ward v. Taggart* (1959) 51 Cal.2d 736, 742.) Nor may he argue that the trial court abused its discretion in failing to devise a different solution. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 389 (*Bryant*); *People v. Montes* (2014) 58 Cal.4th 809, 843; *People v. Duran* (1976) 16 Cal.3d 282, 289). Similarly, defendant's jurisdiction argument is undermined by the absence of a challenge below. (See *People v. Mower* (2002) 28 Cal.4th 457, 474, fn. 6 [acts in excess of jurisdiction are subject to waiver and forfeiture].)

Defendant argues that he should not be bound by his counsel's stipulation, which occurred before she was formally appointed. The timing here was immaterial. The stipulation was made to facilitate counsel's appointment. Counsel was appointed shortly thereafter, whereupon the stipulation became effective for all subsequent attorney-client meetings. There was one brief consultation in the interim. However, even if that meeting was outside the stipulation for purposes of our forfeiture analysis, defendant fails to identify anything of consequence that occurred to support his claims of error.

10

In addition, nothing prevented counsel from revisiting the terms of the stipulation after speaking with defendant.[10] Defendant counters the record does not reveal whether or not counsel told him about the arrangement extending the attorney-client privilege to the attending officers. We will not presume counsel's omission. It is defendant's burden to show that counsel performed deficiently, by developing the record on habeas corpus if necessary. (*People v. Pope* (1979) 23 Cal.3d 412, 425 (*Pope*), overruled on another ground in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10; see generally *People v. Fosselman* (1983) 33 Cal.3d 572, 581-582.)

Defendant further argues that counsel could not be counted on to object on his behalf to an order made solely for counsel's benefit and contrary to his rights and interests. His only authority involves a failure to object to an award of attorney's fees, a circumstance that is readily distinguishable. (Cf. *People v. Viray* (2005) 134 Cal.App.4th 1186, 1214.) Security risks occur with some frequency, and do not invariably create a conflict of interest for counsel. Defendant points to no evidence in the record that counsel labored under an actual conflict that adversely affected her performance. (*Cuyler v. Sullivan* (1980) 446 U.S. 335, 348.) On the contrary, counsel agreed to the arrangement only after receiving express assurances from the prosecution that it would not compromise the attorney-client privilege. Nor does defendant demonstrate that the potential risk to counsel's safety caused her to perform deficiently. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.)

---

**10**    We address separately, *post*, defendant's claim that he was deprived of his statutory and constitutional rights to be present during the hearing where the court ordered the correctional officers to provide security for defense counsel.

11

Further, it is not accurate to say the arrangement was made solely for counsel's benefit. Defendant was entitled to counsel. His own statements and admitted conduct made securing willing and capable counsel uniquely difficult. The court's action was taken to ensure that defendant's right to counsel was honored.

Even were we to overlook defendant's forfeiture and reach the merits, there is no basis for relief. Evidence Code section 954 affords the client "a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between the client and lawyer." (*Zurich*, *supra*, 155 Cal.App.4th at p. 1494.) Absent actual disclosure, or a demand for disclosure, the statute is simply not implicated. (*People v. Alexander* (2010) 49 Cal.4th 846, 887 (*Alexander*).) In *Alexander*, we rejected the defendant's claim that a police detective's interception and recording of a three-way call between the defendant, his mother, and a defense investigator violated the statutory attorney-client privilege. We reasoned: "Defendant has made no showing that any witness disclosed any information from the call during the proceedings in violation of Evidence Code section 954. Indeed, substantial evidence supports the trial court's findings that the call's contents were not disclosed to the prosecutors." (*Id.* at p. 887, fn. omitted.) Likewise here, the prosecutor did not seek to discover or offer evidence of confidential communications. Additionally, there is no evidence that the officers ignored the admonition by disclosing confidential communications to anyone. In short, nothing before us indicates the officers' presence violated defendant's rights.

We likewise reject defendant's challenge to the necessity of the security arrangements, and the availability of less intrusive alternatives. "In general, the 'court has broad power to maintain courtroom security and orderly proceedings' [citation], and its decisions on these matters are reviewed for abuse of discretion."

12

(*People v. Lomax* (2010) 49 Cal.4th 530, 558 (*Lomax*).) Given that defendant had killed two people with his bare hands and had vowed to kill again, the trial court did not abuse its discretion by adopting the parties' proposed solution to a clear security problem.

We emphasize, however, that we do not suggest such measures are necessary or appropriate in every circumstance. Ordering law enforcement officers to be present at attorney-client meetings is an unorthodox solution with obvious potential pitfalls. We hold only that, under these extreme circumstances, the court did not abuse its discretion. Trial courts are well advised to fashion security measures tailored to minimize the risk of intrusion on the defendant's constitutional rights. With these observations in mind, we turn to defendant's Sixth Amendment claim.

### c. *Deprivation of the Right to Counsel*

Defendant argues that the right to confidential communications is "absolute and essential to both the federal and state right to representation by counsel." (Citing *In re Rider* (1920) 50 Cal.App. 797, 799.) According to defendant, the officers involved here were members of the prosecution team, and their presence during attorney-client consultations destroyed confidentiality despite the parties' stipulation to the contrary. Defendant claims that the officers' presence had a chilling effect on his communications with counsel and his defense preparation, resulting in a "wholesale evisceration" of his right to counsel under both the Sixth Amendment and article I, section 15 of the California Constitution. These circumstances, he argues, were "tantamount to a failure to appoint counsel at all," and amounted to structural error. The appellate record fails to support defendant's claims of error.

13

As explained in *Alexander*, *supra*, 49 Cal.4th 846, the federal Constitution does not protect confidential communications between a defendant and his attorney for their own sake. "No federal constitutional provision . . . establishes an attorney-client communication privilege. Rather, the Sixth Amendment guarantees a criminal defendant the right to 'assistance of counsel for his defense.' (U.S. Const., 6th Amend.) Confidential communication between a defendant and his lawyer is itself not a separate 'right' that the federal Constitution guarantees, but rather an aspect of ensuring fulfillment of the right to assistance of counsel." (*Alexander*, *supra*, 49 Cal.4th at pp. 887-888.)

*Alexander* held that interception of attorney-client communications does not constitute a complete denial of the right to counsel. (*Alexander*, *supra*, 49 Cal.4th at p. 888.) Citing *Weatherford v. Bursey* (1977) 429 U.S. 545 (*Weatherford*), we explained that the Supreme Court had "rejected a per se rule that ' "whenever the prosecution knowingly arranges or permits intrusion into the attorney-client relationship the right to counsel is sufficiently endangered to require reversal and a new trial." ' " (*Alexander*, at p. 888, quoting *Weatherford*, at p. 549.) The high court made clear that "unless the record supports 'at least a realistic possibility of injury to [the defendant] or benefit to the State, there can be no Sixth Amendment violation.' " (*Alexander*, at p. 888, quoting *Weatherford*, at p. 558.)

Accordingly, we look to *Weatherford*, *supra*, 429 U.S. 545, to evaluate defendant's Sixth Amendment claim. Weatherford was an undercover agent for a state law enforcement agency. He vandalized a local office of the Selective Service with Bursey and two others. To maintain his undercover status, Weatherford was arrested and charged along with Bursey. Before trial, Weatherford was invited to two meetings where Bursey and his attorney discussed defense tactics. Weatherford did not share the details of these meetings with

14

anyone. However, he did testify at Bursey's trial regarding his own undercover activities and Bursey's act of vandalism. After Bursey was convicted, he filed a civil rights action against Weatherford and his supervisor under 42 United States Code section 1983, alleging that he had been deprived of his Sixth Amendment right to the assistance of counsel. (*Weatherford*, at pp. 547-549.)

In evaluating the Sixth Amendment claim, the high court rejected the notion that a constitutional violation can be made out "whenever conversations with counsel are overheard" by a government agent. (*Weatherford*, *supra*, 429 U.S. at p. 551.) Rather, the court held that "the constitutionality of the conviction depends on whether the overheard conversations have produced, directly or indirectly, any of the evidence offered at trial." (*Id*. at p. 552.) The court identified several relevant factors, including whether: (1) a witness testifies at trial about the confidential conversations; (2) any of the state's evidence originated in these conversations; (3) the conversations were communicated to the prosecutor; or (4) the conversations were used in any other way to the defendant's substantial detriment. (*Id*. at p. 554.) The court noted that "[n]one of these elements is present here . . . . Weatherford's testimony for the prosecution about the events of March and April 1970 revealed nothing said or done at the meetings . . . that he attended. None of the State's evidence was obtained as a consequence of Weatherford's participation in those meetings." (*Id*. at p. 555, fn. omitted.) Further, the district court expressly found that Weatherford had not communicated anything about the meeting to either his superiors or the prosecution. (*Id*. at p. 556.)

Applying the *Weatherford* factors to defendant's claim, he fails to establish a constitutional violation. The officers who provided security were expressly

15

admonished not to reveal the content of any overheard conversations *to anyone*.[11] Again, there is no evidence they disregarded the court's admonishment by disclosing confidential communications. Nor did the officers testify regarding any attorney-client conversation. Finally, defendant fails to identify any evidence allegedly developed as a result of the correctional officers' presence. It is defendant's obligation to make such a record. (*People v. Ervine* (2009) 47 Cal.4th 745, 770 (*Ervine*).)[12]

Citing *Ervine*, *supra*, 47 Cal.4th 745, defendant argues that a Sixth Amendment violation can be predicated on a showing that confidential attorney-client information was intercepted by *any member* of the prosecution team. He argues that the officers who provided security at attorney-client meetings and in court were part of the prosecution team because the California Department of Corrections and Rehabilitation (CDCR) investigated the charged crimes and

---

**11** During pretrial proceedings, the trial court admonished Officers Martinez and Kaszap regarding the attorney-client privilege. On December 22, 1999, the court admonished two additional officers, Masters and Klose. A third officer, Sergeant Eric Griem, was in charge of courtroom security during trial. Although defendant complains that Griem was not separately admonished, the record indicates that the supervising officers were aware of the stipulation. The same three officers were used for courtroom security throughout the trial.

**12** In *Alexander* we observed that no decision of the high court "has answered the questions left unresolved in *Weatherford*—what showing of injury to the defendant or benefit to the state is, *in the affirmative*, required to prove a Sixth Amendment violation, and who bears the burden of persuasion." (*Alexander*, *supra*, 49 Cal.4th at p. 889, fn. 23; see also *Ervine*, *supra*, 47 Cal.4th at p. 766.) We need not opine on that question here. Because defendant did not object below or request a hearing on the effect of the asserted interference, the People had no opportunity to litigate that point. Under these circumstances, we apply the general rule that defendant, the party challenging the judgment, has the burden of providing an adequate appellate record. (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574-575; *Gee v. American Realty & Construction, Inc.* (2002) 99 Cal.App.4th 1412, 1416.)

16

conducted the cell extractions introduced as circumstances in aggravation. Relying on cases that interpret the scope of the prosecution team for purposes of statutory discovery and the disclosures mandated by *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), defendant argues that "[b]ecause in this case all attorney-client conferences were conducted in the close proximity of [CDCR] employees, there can be no dispute that confidential information was actually communicated to the prosecution team." (Citing *In re Steele* (2004) 32 Cal.4th 682, 696-697; *People v. Superior Court* (*Barrett*) (2000) 80 Cal.App.4th 1305, 1317 [concluding that CDCR has a "hybrid status" when it both provides administrative and security functions in housing felons and investigates crimes committed in the prison].)

First, we note that defendant's bald assertion that confidential communications were actually revealed is purely speculative. Further, defendant reads too much into *Ervine*. There, Sacramento County jail personnel entered the defendant's cell while he was in court and read his confidential defense documents. None of that information was communicated to the chief assistant Attorney General who prosecuted the case, or to the Lassen County District Attorney. (*Ervine*, *supra*, 47 Cal.4th at p. 763.) Applying *Weatherford*, *supra*, 429 U.S. 545, we concluded the lack of evidence that the sheriff's department "communicated any confidential information to anyone" *defeated* defendant's Sixth Amendment claim. (*Ervine*, at p. 765.) To support this conclusion, we drew an analogy to the scope of liability under *Brady* (see *Ervine*, at p. 768), and observed that "[t]he agency responsible for intruding on defendant's relationship with his attorney (the Sacramento County Sheriff's Department) was completely unrelated to the agency actually prosecuting defendant (the Lassen County District Attorney's Office)" (*id*. at p. 767). Nonetheless, because the relationship between the agencies in *Ervine* was tangential, we were not called upon to consider what degree of association *would be sufficient* to establish a Sixth Amendment violation

17

based on receipt of confidential attorney-client information by a government actor other than the prosecutor.

*Weatherford*, however, did consider that question, and rejected an argument similar to the one defendant advances here. Unlike the officers in this case, Weatherford *was* involved in the investigation and called as a prosecution witness. Bursey argued that Weatherford was therefore "a member of the prosecuting team whose knowledge of Bursey's trial plans was alone enough to violate Bursey's constitutional right to counsel and to vitiate Bursey's conviction. [Citation.]" (*Weatherford*, *supra*, 429 U.S. at p. 556.) The court disagreed: "Though imaginative, this reasoning is not a realistic assessment of the relationship of Weatherford to the prosecuting staff or of the potential for detriment to Bursey or benefit to the State that Weatherford's uncommunicated knowledge might pose." (*Ibid*.) Rather, the court looked to whether the receipt of confidential information by persons *other than the prosecutor* resulted in testimony or other evidence against the defendant. (*Id*. at p. 554.) As noted, defendant made no such showing here.

Defendant asserts, "[b]ecause in this case all attorney-client conferences were conducted in the close proximity of [CDCR] employees," this fact "establishes a very real possibility" of injury to defendant's case. *People v. Rich* (1988) 45 Cal.3d 1036, rejected the defendant's claim that the presence of an officer during psychiatric interviews violated his right to counsel, observing that the officer "was instructed not to repeat anything he heard during the interview" and that the officer assured defense counsel that he would not do so. (*Id*. at p. 1099, fn. 16.) These officers were similarly instructed, and, as noted, defendant points to nothing in the record to show they violated the court's directive.

Defendant contends that the officers' presence had a "chilling effect" on his communications with counsel and undermined his ability to assist in his defense.

18

He reasons that "nothing is more likely to impair the effectiveness of an attorney than the inability to communicate freely and privately with his client" and that "an attorney who will not consult in private with her client cannot be said to satisfy the requirements of the Sixth Amendment or the California Constitution." *Ervine* rejected a similar claim that, as an " 'inevitable consequence' " of law enforcement having reviewed his confidential legal materials, the defendant had an " 'enduring fear' " concerning his private communications with counsel, which deprived him of counsel's effective assistance. (*Ervine*, *supra*, 47 Cal.4th at p. 769.) We held that "a defendant's inability to consult with counsel or to assist in his defense must appear in the record." (*Ibid*.) The defendant had "fail[ed] to identify any instance in which his relationship with counsel was impaired" despite having been offered the opportunity to submit additional evidence at the time the trial court denied his motion to dismiss. (*Ibid*.) "Because his claim still is not supported by any reference to the record, we must reject it." (*Ibid*.)

So too here. Defendant observes that after he first met with defense counsel on August 6, 1999 in the presence of correctional officers, he told the court that he had "nothing to discuss" with counsel and that he had "no intentions to discuss anything with her." He invites us to infer from these comments that he was reluctant to speak in the presence of officers. The remark is taken out of context. Immediately before defendant's statements, the court and counsel had been discussing dates for the preliminary hearing. Asked if he was willing to waive time, defendant responded that he wanted a preliminary hearing within 10 days so that it would be "done and over with." The court noted that 10 days would not give defense counsel time to prepare, and asked defendant, "You don't want [defense counsel] to have any time?" It was at this point that defendant responded he had nothing to discuss with counsel. Taken in totality, defendant's comments

19

reveal an expression of his indifference to the criminal process, rather than his reluctance to discuss his case in the presence of correctional officers.

In any event, any asserted reluctance to assist counsel was short-lived. On November 20, 1999, after the preliminary hearing, defendant was arraigned. Asked if he would like to have counsel appointed, defendant responded affirmatively. He voiced no objection when the court appointed Ms. Tarter to continue her representation. He also agreed to waive time to accommodate defense counsel's requested trial dates. On December 16, 1999, defense counsel stated on the record that she had been "talking [with Mr. Delgado] for about a half an hour or so" and that she was requesting additional time to investigate the case. On March 30, 2000, counsel conveyed defendant's request that he be allowed to view the videotape evidence. Counsel indicated that she would be consulting with defendant at the prison and that the prison litigation staff had been "very cooperative."

Defendant also asserts that, during court proceedings, "he could not whisper to his attorney, nor pass her confidential notes, without also revealing his communications to the correctional officers who were 'circling around' him, between [defendant] and attorney Tarter." The record before us is not entirely clear as to the officers' positions in court. (See *ante*, at p. 8.) Significantly, there is no direct evidence that the officers' presence impeded defendant's ability to whisper to counsel or pass her notes. On the contrary, the officer in charge of courtroom security confirmed that defendant's hands would be unrestrained and he would be given a pen so that he could communicate with his attorney in writing. This circumstance does not resemble *People v. Zammora* (1944) 66 Cal.App.2d 166, wherein reversible error was found because the 22 defendants were seated at some distance from counsel's table and were not allowed to approach or consult

20

with counsel either during sessions or as they left the courtroom. (*Id*. at pp. 226-236.)

The fact that neither defense counsel nor defendant voiced any concern about the officers' presence further undercuts his claim of a chilling effect. Although defense counsel initially agreed to the arrangement, she was certainly free to revisit the issue if it proved unworkable. She did not thereafter object or otherwise alert the court that the arrangement negatively affected her ability to communicate with defendant. Likewise, at no time did defendant raise a concern with the court about the presence of the officers. Defendant counters that no inference may be drawn from his silence because the record does not show that counsel even told him about the arrangement. His argument is unpersuasive. First, there is no evidence that counsel *failed* to so advise defendant that the officers were bound by the privilege. It is defendant's burden to show that counsel performed deficiently. (*Pope*, *supra*, 23 Cal.3d at p. 425.) Second, and significantly, defendant was present in court on December 22, 1999 when the court admonished the officers that they were bound by the privilege and expressly ordered them not to disclose any overheard communications. Thereafter, on April 14 and again on May 2, 2000, the trial court asked defendant whether there was any reason the trial could not proceed. Defendant responded that there was not. Defendant's claimed inability to consult with counsel or assist in his defense is unsupported by any evidence in the record. (*Ervine*, *supra*, 47 Cal.4th at p. 769.) Accordingly, his Sixth Amendment claim fails. (*Alexander*, *supra*, 49 Cal.4th at p. 889.)

Defendant fares no better with his claim that his right to counsel under article I, section 15 of the California Constitution was violated. Defendant cites *Barber v. Municipal Court* (1979) 24 Cal.3d 742 (*Barber*), which held that the right to counsel "embodies the right to private consultation with counsel" and "is

21

violated when a state agent is present at confidential attorney-client conferences." (*Id*. at p. 752.) *Barber* is distinguishable. In that case, an undercover police officer posed as a codefendant and attended attorney-client meetings. (*Id*. at pp. 745, 748-749.) During that time, he communicated regularly with his superior officers and disclosed that "the defense was to become more 'political.' " (*Id*. at p. 749.) When petitioners learned of the breach in attorney-client confidences, they moved to dismiss the charges. (*Id*. at p. 745, 749-750.) Petitioners' attorney testified that his clients became " 'paranoi[d]' " after learning that they had been infiltrated by an informant. (*Id*. at p. 750.) The clients, who had once actively participated in meetings with counsel, became reluctant to speak. They were distrustful of each other and of defense counsel's assistant. The attorney opined that his clients' ability to assist in preparing a defense had been " 'substantially impaired.' " (*Ibid*.) On that record, we held that the clients were deprived of their state constitutional right to communicate privately with counsel, and that the appropriate remedy was dismissal. (*Id*. at p. 756, 760.)

Defendant argues that the interference here was even more pervasive than in *Barber*. Not so. In *Barber*, some of the content of attorney-client conversations was actually relayed to other officers, and there was a demonstrated chilling effect on attorney-client communications. (*Barber*, *supra*, 24 Cal.3d at p. 756.) Neither of those circumstances is present here. The court in *Alexander*, on a record similar to this case, questioned whether the defendant's state constitutional right to counsel was violated "notwithstanding broad language used in the much more egregious circumstances of *Barber*." (*Alexander*, *supra*, 49 Cal.4th at p. 895; accord, *Ervine*, *supra*, 47 Cal.4th at p. 770 [distinguishing *Barber*].) *Barber*'s holding that a violation of the right to counsel is shown "when a state agent is present at confidential attorney-client conferences" (*Barber*, at p. 752), must be understood in light of its facts, which differ markedly from those here.

22

Additionally, it is significant that "*Barber* involved an application for a pretrial writ of prohibition, while the present case is an appeal from a judgment of conviction and sentence." (*Alexander*, *supra*, 49 Cal.4th at p. 896.)  As such, this case is subject to article VI, section 13 of the California Constitution, which provides that "[n]o judgment shall be set aside . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."  Defendant argues that the denial of confidential communications rendered counsel's appointment "a mere formality without any substance," and therefore amounted to a miscarriage of justice regardless of the evidence at trial.  A similar claim failed in *Alexander*, where we observed that the defendant "had counsel, and his attorney vigorously pursued his interests throughout the trial." (*Alexander*, at p. 896.)  Likewise here, defense counsel actively participated in all aspects of the trial, including jury selection, challenging evidence admissibility, cross-examining witnesses, proposing jury instructions, presenting defense witnesses at the penalty phase, and arguing vigorously against a sentence of death.  Because " 'defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis.' " (*Neder v. United States* (1999) 527 U.S. 1, 8, quoting *Rose v. Clark* (1986) 478 U.S. 570, 579; accord, *Alexander*, *supra*, 49 Cal.4th at pp. 896-897.)

For the same reasons that defendant has failed to prove his other constitutional claims, he has also failed to demonstrate a reasonable probability that, absent any alleged violation, the trial's outcome would have been more favorable.  "No evidence establishes the prosecution gained anything from [the officers' presence] or that the defense was affected negatively in a way that could have changed the trial's outcome." (*Alexander*, *supra*, 49 Cal.4th at p. 899.)

23

Additionally, the evidence against defendant was compelling and included his own statements and videotaped reenactments of the murders.[13]

### d. Denial of the Right to Be Present

Defendant claims that his absence from the August 6 proceeding at which the court ordered that officers be present at attorney-client meetings violated his constitutional right to due process and his statutory rights (§§ 977, 1043). He claims that his presence bore a reasonable and substantial relation to his opportunity to fully defend against the charges and would have contributed to the fairness of the proceeding. According to defendant, had he been present, he could have objected to his counsel's "stipulat[ing] away" the right to private and confidential consultation. He could have opposed the order on the grounds that it was unnecessary and that it involved officers who were coworkers of several witnesses and one of the victims in the case. Had he been present, he would have had an opportunity to reject Tarter's appointment and proceed pro se. Alternatively, had he accepted counsel's appointment, he would have been on notice that the court had extended the attorney-client privilege to the officers, thus ameliorating the chilling effect of their presence.

---

[13] Defendant also summarily asserts that "[t]he elimination of confidential communications with counsel violated [his] right to due process under the state and federal constitutions . . . ." He provides no substantive analysis to support this claim. In any event, for the same reasons we set out above, we conclude the presence of officers during attorney-client meetings did not render his trial fundamentally unfair. As in *Alexander*, *supra*, 49 Cal.4th 846, "there has been no showing that (1) the purpose of [the officer's presence] was to discover defense strategy, (2) information . . . was communicated to the prosecutors, or (3) law enforcement agents utilized, or even could have utilized, information conveyed [during the meetings]." (*Id*. at pp. 891-892.) Additionally, there has been no showing that the officers' presence interfered with attorney-client communications or trial preparation.

24

" ' "Due process guarantees the right to be present at any 'stage that is critical to [the] outcome' and where the defendant's 'presence would contribute to the fairness of the procedure.' " [Citation.]  " 'The state constitutional right to be present at trial is generally coextensive with the federal due process right. [Citations.]' [Citation.]  Neither the state nor the federal Constitution, nor the statutory requirements of sections 977 and 1043, require the defendant's personal appearance at proceedings where his presence bears no reasonable, substantial relation to his opportunity to defend the charges against him.  [Citations.]" [Citation.]  "Defendant has the burden of demonstrating that his absence prejudiced his case or denied him a fair trial." ' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1254 (*Gonzales*).)

We need not decide whether our state statutes or principles of due process entitled defendant to be present during the in-chambers conference on August 6, 1999.  Any error in excluding him was harmless.  (See *People v. Thompson* (2016) 1 Cal.5th 1043, 1098-1099.)  Defendant had ample opportunity to raise these issues in subsequent proceedings during which he was present.  He was obviously aware of the officers' presence from the very first meeting with counsel.  At arraignment, he voiced no concern about the officers' presence; nor did he object to counsel's appointment or ask to proceed pro se.  Subsequently, defendant was present when the judge admonished officers in open court that they were bound by the attorney-client privilege.  Again defendant raised no concerns about a chilling effect on his communications with counsel; nor did he request to proceed pro se. As noted, before trial the court twice asked defendant personally if there was any reason that trial could not begin.  He voiced none.  Defendant had ample and multiple opportunities to explore these security issues.  His exclusion from the

25

initial in camera hearing was not prejudicial. (Cf. *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1041.)[14]

Defendant further contends that he was denied his Sixth Amendment right " ' "to be personally present at any proceeding in which his appearance is necessary to prevent 'interference with [his] opportunity for effective cross-examination.' " ' " (*Gonzales, supra,* 54 Cal.4th at pp. 1253-1254.) He reasons that "while [he] was physically present during trial, he was unable to assist counsel with cross-examination without disclosing his comments to correctional officers at the same time, and thus, it was no different than if he had been tried *in absentia.*" This remarkable claim is without merit. Defendant was present during all trial proceedings where evidence was taken. The record discloses that defendant's hands were unrestrained and he was able to write notes to defense counsel. Additionally, there is no evidence other than defendant's bare assertion that he was unable to speak to defense counsel during trial due to the presence of correctional officers. At no time did defendant advise the court of his asserted concern. The record reveals no interference with defendant's opportunity to assist counsel in conducting effective cross-examination.

---

[14]     Defendant urges us to revisit our precedent holding that "[e]rroneous exclusion of the defendant is not structural error that is reversible per se, but trial error that is reversible only if the defendant proves prejudice." (*People v. Perry* (2006) 38 Cal.4th 302, 312; accord, *People v. Bradford* (1997) 15 Cal.4th 1229, 1357.) He argues that the exclusion here cannot be assessed for harmlessness because the error occurred before the presentation of evidence and was unrelated to the strength of the evidence. This distinction is inapposite. There are many reasons an error can be deemed harmless. As explained, the alleged error in excluding defendant from the in camera proceeding was harmless because he had other opportunities to raise this subject with the court, which could then have directly considered his objection and taken any necessary action.

## 2. Multiple Convictions for First Degree Murder and Aggravated Assault by a Life Prisoner (§ 4500)

Defendant contends that his convictions for first degree murder must be reversed because they are necessarily included in the offense of aggravated assault by a life prisoner, of which he was also convicted. He is incorrect.

"While section 654 prohibits multiple *punishment*, it is generally permissible to *convict* a defendant of multiple charges arising from a single act or course of conduct. (§ 954; *People v. Ortega* (1998) 19 Cal.4th 686, 692.) However, a 'judicially created exception to this rule prohibits multiple convictions based on necessarily included offenses. [Citations.]' (*People v. Montoya* (2004) 33 Cal.4th 1031, 1034.)" (*People v. Sanders* (2012) 55 Cal.4th 731, 736.)

"In deciding whether multiple conviction is proper, a court should consider only the statutory elements." (*People v. Reed* (2006) 38 Cal.4th 1224, 1229.) "Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former." (*Id*. at p. 1227.) In other words, " '[i]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.' " (*Ibid*., quoting *People v. Lopez* (1998) 19 Cal.4th 282, 288.)

Section 4500 provides: "Every person while undergoing a life sentence, who is sentenced to state prison within this state, and who, with malice aforethought, commits an assault upon the person of another with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury is punishable with death or life imprisonment without possibility of parole. The penalty shall be determined pursuant to the provisions of Sections 190.3 and 190.4; however, in cases in which the person subjected to such assault does not die within a year and a day after such assault as a proximate result thereof, the

27

punishment shall be imprisonment in the state prison for life without the possibility of parole for nine years."

Defendant reasons that section 4500 contains all of the elements of murder: (1) an assault upon another person with a deadly weapon or instrument, or by means of force likely to produce great bodily injury; (2) with malice aforethought; (3) that causes the death of the victim within a year and a day; plus the additional element (4) that the assault be committed by a prisoner in state prison while undergoing a sentence of life imprisonment.

" 'The words malice aforethought in section 4500 have the same meaning as in sections 187 [murder] and 188 [malice definition].' " (*People v. St. Martin* (1970) 1 Cal.3d 524, 537, quoting *People v. Chacon* (1968) 69 Cal.2d 765, 781.) "Malice may be either express or implied. It is express when the defendant manifests 'a deliberate intention unlawfully to take away the life of a fellow creature.' (§ 188.) It is implied . . . 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' [citation]." (*People v. Lasko* (2000) 23 Cal.4th 101, 107.) In other words, express malice requires an intent to kill. Implied malice does not.

Defendant's argument overlooks the fact that he was convicted of *first degree* murder. Section 189 defines first degree murder as an unlawful killing with malice aforethought that is willful, premeditated and deliberate. (§ 189; *People v. Chiu* (2014) 59 Cal.4th 155, 166; see also *id.* at p. 163 [premeditation and deliberation are elements of first degree murder, not a separate penalty provision].) "Willful" means intentional; "premeditated" means thought over in advance; "deliberate" means careful weighing of considerations in forming a course of action. (See CALCRIM No. 521; *People v. Koontz* (2002) 27 Cal.4th

28

1041, 1080.) One who violates section 4500 does not necessarily harbor an express intent to kill, nor does he necessarily act with premeditation and deliberation, all of which are required for this type of first degree murder.

First degree murder also includes an unlawful killing with malice aforethought that is perpetrated by certain specified means (such as a destructive device, poison, lying in wait, torture, etc.), and an unlawful killing during the commission or attempted commission of certain listed felonies. (§ 189; *People v. Chun* (2009) 45 Cal.4th 1172, 1182; *People v. Dillon* (1983) 34 Cal.3d 441, 465-472, 475-477.) One who violates section 4500 does not necessarily do so by any of the means specified in section 189. Nor does a violation of section 4500 predicated on felony assault come within the list of qualifying felonies for first degree felony murder. These alternative theories of first degree murder are not implicated by the facts here, nor were they relied upon by the prosecution at trial. We mention them, however, because the elements test turns not on the specific facts of a case but on the elements set out in the statute.

Because it is possible to violate section 4500 without committing murder in the first degree, the latter offense is not included in the former. Accordingly, defendant was properly convicted of both offenses in the killings of Mendoza and Mahoney.

### 3. Claims of Instructional Error

The trial court instructed the jury with CALJIC Nos. 2.01 (sufficiency of circumstantial evidence), 2.21.2 (willfully false testimony), 2.22 (weighing conflicting testimony), 2.27 (sufficiency of testimony of a single witness), 2.51 (motive) and 8.20 (willful, deliberate, and premeditated murder) at the guilt phase. It repeated all of these instructions except CALJIC No. 8.20 at the penalty phase. Defendant claims these standard instructions undermined the prosecution's burden

of proof beyond a reasonable doubt.[15]  He acknowledges that we previously have rejected these claims (see, e.g., *People v. Casares* (2016) 62 Cal.4th 808, 831-832 (*Casares*)), but urges us to reconsider.  He offers no persuasive reason to do so.[16]

"CALJIC No. 2.01 does not alter the burden of proof, nor does it create a mandatory presumption of guilt." (*People v. Bonilla* (2007) 41 Cal.4th 313, 338, and cases cited.)  The instruction "properly direct[s] the jury to accept an interpretation of the evidence favorable to the prosecution and unfavorable to the defense only if no other 'reasonable' interpretation can be drawn.  Particularly when viewed in conjunction with other instructions correctly stating the prosecution's burden to prove defendant's guilt beyond a reasonable doubt, [this] circumstantial evidence instruction[] do[es] not reduce or weaken the prosecution's constitutionally mandated burden of proof or amount to an improper mandatory presumption of guilt." (*People v. Kipp* (1998) 18 Cal.4th 349, 375.)

Defendant counters that "[a]n instruction that dilutes the beyond-a-reasonable-doubt standard of proof on a specific point is not cured by a correct general instruction on proof beyond a reasonable doubt."  He overlooks the fact that CALJIC No. 2.01, as given, specifically referred to the reasonable doubt standard, stating that "each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt."  It also provided:  "if the circumstantial evidence as to any particular count permits two reasonable interpretations, one of which points to the

---

**15**    Although defendant failed to object to these instructions in the trial court, he may challenge them on the ground that they affected his substantial rights. (§ 1259; *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7.)

**16**    Defendant argues that the penalty phase instructions were defective for the same reasons that the guilt phase instructions were defective.  Our resolution of his claims applies equally to both phases of the trial.

defendant's guilt and the other to his innocence, you must adopt that interpretation that points to the defendant's innocence, and reject that interpretation that points to his guilt." There is no reasonable likelihood that the jury understood this instruction to dilute the burden of proof or create a mandatory presumption of guilt. (See *People v. Smithey* (1999) 20 Cal.4th 936, 963.)

CALJIC No. 2.21.2 does not reduce the prosecution's burden of proof. (*People v. Beardslee* (1991) 53 Cal.3d 68, 95.) As given, it informed the jury that "[y]ou may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars." Defendant argues that the instruction "lightened the prosecution's burden of proof by allowing the jury to credit prosecution witnesses if their testimony had a 'mere probability of truth.' " However, the instruction "says no such thing." (*People v. Nakahara* (2003) 30 Cal.4th 705, 714 (*Nakahara*).) It " 'does nothing more than explain to a jury one of the tests they may use in resolving a credibility dispute.' " (*Beardslee*, at p. 95; quoting *People v. Blassingill* (1988) 199 Cal.App.3d 1413, 1419.) It does not speak to, nor does it conflict with, the ultimate burden of proof applicable to the elements of the charge. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 493; see *People v. Centeno* (2014) 60 Cal.4th 659, 672.) The instruction " 'is unobjectionable when, as here, it is accompanied by the usual instructions on reasonable doubt, the presumption of innocence, and the People's burden of proof.' " (*People v. Kelly* (2007) 42 Cal.4th 763, 792 (*Kelly*), quoting *Nakahara*, at p. 715; accord, *People v. Riel* (2000) 22 Cal.4th 1153, 1200.)

Defendant criticizes precedent that looks to the reasonable doubt instruction as a cure for an alleged ambiguity, particularly where the challenged instruction itself contains no such cross-reference. We have long held that "the correctness of jury instructions is to be determined from the entire charge of the court, not from a

31

consideration of parts of an instruction or from a particular instruction." (*People v. Burgener* (1986) 41 Cal.3d 505, 538, disapproved on another ground in *People v. Reyes* (1998) 19 Cal.4th 743, 753.) Thus, " '[t]he absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole.' " (*Burgener*, at p. 539.) The jury here was given CALJIC No. 1.01, which told them to "[c]onsider the instructions as a whole and each in light of all the others." Given the emphasis placed on proof beyond a reasonable doubt throughout the charge (see, e.g., CALJIC Nos. 2.01, 2.02, 2.61, 2.90, 7.35, 8.71, 8.75, 8.80.1, 17.01, 17.10, 17.25), we reject defendant's suggestion that "[i]t is just as likely the jurors concluded that the reasonable doubt instruction was qualified or explained by the other instructions that contain their own independent references to the evaluation or sufficiency of particular evidence."

CALJIC No. 2.22's direction to consider "the convincing force of the evidence" in weighing the testimony of a number of witnesses, did not lessen the prosecution's burden of proof where the instructions as a whole correctly instructed the jury on that burden. (*People v. Cleveland* (2004) 32 Cal.4th 704, 751 (*Cleveland*).) Contrary to defendant's argument, there is no reason to presume the jury would equate the word "convincing" with the lesser preponderance of the evidence standard, which was nowhere mentioned in the instructions given.

CALJIC No. 2.27, as given, told the jury that "[t]estimony by one witness which you believe concerning any fact is sufficient for the proof of that fact." Contrary to defendant's argument, the instruction did not erroneously suggest that defendant had the burden of proving facts, rather than simply raising a reasonable doubt about the prosecution's case. The instruction " 'is unobjectionable when, as here, it is accompanied by the usual instructions on reasonable doubt, the

32

presumption of innocence, and the People's burden of proof.' " (*Kelly*, *supra*, 42 Cal.4th at p. 792.) Specifically, CALJIC No. 2.90, as given, told the jury that defendant was "presumed to be innocent until the contrary is proved," and that "[t]his presumption places upon the People the burden of proving him guilty beyond a reasonable doubt." CALJIC No. 2.61, as given, told the jury that "[i]n deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him. No lack of testimony on defendant's part will make up for a failure of proof by the People so as to support a finding against him on any such essential element." In light of the instructions as a whole, CALJIC No. 2.27 is not susceptible to the interpretation defendant suggests.

CALJIC No. 2.51, as given, told the jury that "[m]otive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish the defendant is guilty. Absence of motive may tend to show the defendant is not guilty." Defendant argues that the instruction shifted the burden of proof to him to disprove motive in order to establish his innocence. "But the instruction did not shift the burden of proof. It merely told the jury it may consider the presence or absence of motive. [Citations.] The motive instruction did not itself include instructions on the prosecution's burden of proof and the reasonable doubt standard, but it also did not undercut other instructions that correctly informed the jury that the prosecution had the burden of proving guilt beyond a reasonable doubt." (*Cleveland*, *supra*, 32 Cal.4th at p. 750.) Defendant further argues that the instruction improperly allowed the jury to convict based on the presence of motive alone. Because this argument merely goes to the clarity of the instruction, it is forfeited by defendant's failure to object below. (*Ibid.*) In any

33

event, given the instructions on the elements of the charged crimes and the burden of proof beyond a reasonable doubt, "[w]e find no reasonable likelihood the jury would infer from the motive instruction that motive alone could establish guilt. Moreover, given the strong evidence of guilt aside from motive, the jury certainly did not base its verdicts solely on motive." (*Ibid*.)

Finally, CALJIC No. 8.20 did not mislead the jury regarding the prosecution's burden of proof at the guilt phase. The instruction told the jury that deliberation and premeditation "must have been formed upon preexisting reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation." Defendant argues that "the word 'precluding' could be interpreted to require the defendant to absolutely eliminate the possibility of premeditation, as opposed to raising a reasonable doubt." However, when read in conjunction with the instructions on reasonable doubt, the presumption of innocence, and the People's burden of proof, there is no reasonable likelihood the jury would have interpreted CALJIC No. 8.20 in this manner. (*Nakahara*, *supra*, 30 Cal.4th at p. 715.) "These instructions make it clear that a defendant is not required to absolutely preclude the element of deliberation." (*Ibid*.)

### B. Penalty Phase Issues

#### 1. Constitutionality of Lying-in-Wait Special Circumstance

"At the time of defendant's crime, the special circumstance of murder while lying in wait (former § 190.2, subd. (a)(15)) required 'an intentional murder committed under circumstances which include (1) concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position

34

of advantage.' " (*Casares*, *supra*, 62 Cal.4th at p. 827.)[17]  Defendant argues that the lying-in-wait special circumstance, as interpreted by this court, fails to narrow the class of persons eligible for the death penalty, and fails to provide a " ' "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not," ' " in violation of the Eighth Amendment.  (*Godfrey v. Georgia* (1980) 446 U.S. 420, 427.)  He reasons that there is no meaningful distinction between the lying-in-wait special circumstance and first degree murder predicated on theories of premeditation and deliberation or lying in wait.  As a result, the special circumstance does not perform a narrowing function and can apply to virtually any intentional first degree murder.  For much the same reasons, he argues, murders committed by lying in wait are no more deserving of the extreme sanction of death than other premeditated killings.

As defendant acknowledges, we have repeatedly rejected these claims. (*People v. Streeter* (2012) 54 Cal.4th 205, 252-253 (*Streeter*); *People v. Carasi* (2008) 44 Cal.4th 1263, 1310; *People v. Stevens* (2007) 41 Cal.4th 182, 203-204; *Nakahara*, *supra*, 30 Cal.4th at p. 721; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1148-1149; *People v. Morales* (1989) 48 Cal.3d 527, 557-558, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.)  These holdings were recently reaffirmed in *Casares*, *supra*, 62 Cal.4th 808, which explained, "we have differentiated between the lying-in-wait special circumstance

---

**17**     Defendant committed his crimes before the effective date of Proposition 18, which changed the definition of the lying-in-wait special circumstance from a killing "while" lying in wait to a killing "by means of" lying in wait.  (§ 190.2, subd. (a)(15) as amended by Stats. 1998, ch. 629, §§ 2, 3, pp. 4165-4166, enacted by Prop. 18, as submitted to and approved by voters, Primary Elec. (Mar. 7, 2000) eff. Mar. 8, 2000.)  We recently addressed a challenge to the validity of the amended special circumstance in *People v. Johnson* (2016) 62 Cal.4th 600, 634-637.

and lying in wait as a theory of first degree murder on the bases that the special circumstance requires an intent to kill (unlike first degree murder by lying in wait, which requires only a wanton and reckless intent to inflict injury likely to cause death) and requires that the murder be committed 'while' lying in wait, that is, within a continuous flow of events after the concealment and watching and waiting end. [Citations.] Contrary to defendant's argument, the lying-in-wait special circumstance is not coextensive with either theory of first degree murder; it does not apply to all murders and is not constitutionally infirm." (*Id*. at p. 849.)

*Casares* also rejected defendant's challenge to the validity of the special circumstance on the ground that only three other states use lying in wait as a basis for death eligibility. We observed, apart from noting "the rarity, among capital punishment jurisdictions, of lying in wait as a death-eligibility factor, defendant provides no historical information regarding any change, to or away from, the use of lying in wait for this purpose." (*Casares*, *supra*, 62 Cal.4th at p. 851.) We observed that the high court had not held, "whether by discerning a national consensus on the issue or through some other mode of analysis, that a form of murder as defined by a state, when committed by one with a sufficient degree of participation and without a characteristic deemed to limit culpability as a matter of law was, per se, insufficiently aggravated to permit imposition of the death penalty under the Eighth Amendment." (*Id*. at p. 852.) Finally, we emphasized that " '[m]urder committed by lying in wait has been "anciently regarded . . . as a particularly heinous and repugnant crime." ' " (*Id*. at p. 853, quoting *People v. Edelbacher* (1989) 47 Cal.3d 983, 1023.) For these same reasons, we reject defendant's contentions here.

36

## 2. Constitutionality of Death Eligibility Provision for Aggravated Assault by a Life Prisoner (§ 4500)

Defendant contends that section 4500 violates the Eighth Amendment because it qualifies persons for death based on an arbitrary criterion that fails to promote the goals of retribution and deterrence. He argues that this eligibility provision does not "adequately differentiate . . . in an objective, evenhanded, and substantially rational way" (*Zant v. Stephens* (1983) 462 U.S. 862, 879), murder defendants for whom the jury may consider a death sentence from those for whom it may not. According to defendant, it is irrational to qualify an inmate for death based on "the type of sentence an inmate is serving, rather than the offense underlying that sentence." He argues that others serving determinate term sentences may have committed more heinous crimes than the crimes that qualified defendant for a 25-years-to-life term under the Three Strikes law, but that fact is not accounted for in section 4500's eligibility criteria. He also argues that the death penalty is not a deterrent, and that lesser sanctions such as revoking parole eligibility suffice.

We recently considered and rejected similar claims in *People v. Landry* (2016) 2 Cal.5th 52 (*Landry*). For the reasons stated there, we reject defendant's constitutional challenge to section 4500.

"To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.' " (*Lowenfield v. Phelps* (1988) 484 U.S. 231, 244.)

As to the first requirement, *Landry* noted that "the class of individuals potentially subject to the death penalty under section 4500 is quite circumscribed: persons serving a life sentence who, with malice aforethought, assault another

37

with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury, resulting in the death of the victim within a year and a day." (*Landry*, *supra*, 2 Cal.5th at p. 107.) "The statute easily satisfies the requirement that an eligibility factor 'apply only to a subclass of defendants convicted of [homicide].' (*Tuilaepa v. California* [(1994)] 512 U.S. [967,] 972.)" (*Ibid.*)

Regarding the second requirement, *Landry* explained that "the Legislature has determined that death eligibility for life prisoners who commit an aggravated assault that leads to the victim's death is required to 'protect[] [their fellow] prisoners . . . against the assaults of the vicious, and also to protect the officers who are required to mingle with the inmates, unarmed.' ([*People v.*] *McNabb* [(1935)] 3 Cal.2d [441,] 458; accord, [*People v. Superior Court* (*Bell*) (2002)] 99 Cal.App.4th [1334,] 1341.) By imposing more severe penalties on those serving life sentences, 'the Legislature was attempting to deter severely violent crime by those who might otherwise think themselves immune from punishment because they were already lifetime guests of the state penal system.' (*In re Carmichael* (1982) 132 Cal.App.3d 542, 546.) Along with retribution, deterring attacks by life prisoners and thereby promoting the safety of inmates and correction officers are legitimate penal objectives. (See *Kennedy v. Louisiana* (2008) 554 U.S. 407, 420 (*Kennedy*) ['punishment is justified under one or more of three principal rationales: rehabilitation, deterrence, and retribution'].) These rationales of institutional security, deterrence, and retribution provide a reasonable justification for distinguishing this category of murder from others to which the death penalty does not apply." (*Landry*, *supra*, 2 Cal.5th at pp. 107-108.)

Defendant complains that inmates who are serving a life sentence "are not necessarily more culpable than those serving a determinate sentence and are therefore not necessarily more deserving of execution when they commit fatal assaults while incarcerated." *Landry* rejected a similar argument, noting that

"[s]ection 4500 is a death eligibility statute as opposed to a death selection statute." (*Landry*, *supra*, 2 Cal.5th at p. 106; see *Tuilaepa v. California* (1994) 512 U.S. 967, 971-972.)  In other words, a defendant convicted of violating section 4500 is eligible for the death penalty or, alternatively, life without the possibility of parole.  (*Landry*, at p. 106.)  It is up to the jury to decide whether it will select the death penalty as appropriate.  "There is no requirement at the eligibility stage that a narrowly circumscribed class of defendants for whom the death penalty is reasonably justified be further distinguished according to the particular circumstances that led to their eligibility.  Rather, that is a question that goes to the selection stage and its individualized determination requirement.  Only at that point does the Eighth Amendment require 'a broad inquiry into all relevant mitigating evidence to allow an individualized determination.'  (*Buchanan v. Angelone* [(1998)] 522 U.S. [269,] 276.)"  (*Id*. at p. 108.)  The reason a defendant was a life prisoner at the time of the charged killing may be a relevant consideration for the jury at the penalty phase.  It is not germane, however, to the justification for including such persons in the death-eligible class.  (*Ibid*.)

Landry* further rejected the defendant's reliance on *Sumner v. Shuman* (1987) 483 U.S. 66, a case that struck down as unconstitutional a *mandatory* capital sentencing procedure for prisoners who committed murder while serving a sentence of life without the possibility of parole.  As the Supreme Court noted, under those circumstances, "[w]ithout consideration of the nature of the predicate life-term offense and the circumstances surrounding the commission of that offense, the label 'life-term inmate' reveals little about the inmate's record or character."  (*Sumner*, at p. 81.)  *Landry* found *Sumner*'s holding inapposite to section 4500, which does not impose a mandatory death sentence.  "The [*Sumner*] court did not, however, question the legitimacy of deterrence and retribution as rationales.  In short, the statute in *Sumner* differs from section 4500 in crucial

respects, and defendant's reliance on *Sumner* is misplaced." (*Landry*, *supra*, 2 Cal.5th at p. 111.)

Defendant argues that there are ways other than a death sentence to deter murder in prison, and that statistical evidence suggests capital punishment does not actually deter in-prison homicide. His arguments are misplaced. "The weight and validity of such studies involve policy questions within the Legislature's purview. So, too, do defendant's arguments regarding retributive steps short of death that might be taken against prisoners who kill. These studies do not establish that imposing death eligibility on life prisoners who commit fatal aggravated assaults is constitutionally impermissible." (*Landry*, *supra*, 2 Cal.5th at p. 111.)

Finally, defendant urges that an interjurisdictional comparison demonstrates a lack of societal consensus that the death penalty is warranted for murder by a life prisoner. He argues that only three states, Alabama, Mississippi, and New Hampshire, have a statute equivalent to section 4500. *Landry* characterized a similar argument as "tendentious" because "the vast majority of jurisdictions with the death penalty regard custody status as a significant factor in either death penalty eligibility or death penalty selection, or for both purposes. Of the 31 states and the federal government whose laws currently authorize imposition of the death penalty, the laws of 29 states and the federal government use custody status as a death-eligibility or a death-selection factor, or both. It appears that only Nebraska and South Carolina do not explicitly include custodial status as a death-eligibility or selection factor." (*Landry*, *supra*, 2 Cal.5th at p. 113.) We concluded: "Defendant does not cite, nor has our research found, a single judicial decision from any death penalty jurisdiction that has held that the use of custodial status as either an eligibility or a selection factor for the death penalty violates the Eighth Amendment. Nor has defendant shown that any jurisdiction that reenacted the

40

death penalty following *Furman v. Georgia* [(1972)] 408 U.S. 238, omitted custodial status as either an eligibility or selection factor for purposes of the death penalty. Thus, defendant fails to demonstrate the existence of an historical trajectory supporting a conclusion that the majority, or, indeed, any, of the death penalty jurisdictions has abandoned custody status as a factor for imposing the death penalty." (*Id*. at p. 113.)

Defendant's constitutional challenge to section 4500's death eligibility provision fails.

### 3. Admission of Other Crimes Evidence in Aggravation (§190.3, factor (b))

The prosecution introduced evidence in aggravation of 10 unadjudicated incidents during which defendant was extracted from his prison cell. Defendant argues that, for seven of these incidents, the evidence was legally insufficient to prove that he engaged in criminal activity involving the use or attempted use of force or violence, or express or implied threats to use force or violence (hereafter use, attempt, or threat of violence). (§ 190.3, factor (b) (factor (b)).) According to defendant, admission of this evidence violated his state and federal constitutional rights to due process, equal protection, a fair trial, trial by an impartial jury, and a reliable and non-arbitrary penalty determination. We reject his claims.

#### a. Forfeiture

Defendant failed to object at trial to admission of other crimes evidence on the ground that it did not meet factor (b)'s criteria. He has thus forfeited his appellate claim. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1175 (*Livingston*); *People v. Lewis* (2008) 43 Cal.4th 415, 529 (*Lewis*), disapproved on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919; *People v. Montiel* (1993) 5 Cal.4th 877, 928, fn. 23, disapproved on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13; Evid. Code, § 353.) Defendant urges us to

revisit this precedent because, he claims, a sufficiency of the evidence challenge is preserved by contesting the evidence at trial.  (See, e.g., *People v. McCullough* (2013) 56 Cal.4th 589, 596.)  The rule he cites applies to sufficiency of the evidence challenges to convictions.  We have found that precedent inapplicable to evidence admitted in aggravation.  As we explained in *Montiel*, "Even if defendant need do nothing at trial to preserve an appellate claim that evidence supporting his *conviction* is legally insufficient, a different rule is appropriate for evidence presented at the penalty phase of a capital trial.  There the ultimate issue is the appropriate punishment for the capital crime, and evidence on that issue may *include* one or more other discrete criminal incidents.  (§ 190.3, factors (b), (c).)  If the accused thinks evidence on any such discrete crime is too insubstantial for jury consideration, he should be obliged in general terms to object, or to move to exclude or strike the evidence, on that ground."  (*Montiel*, at p. 928, fn. 23, citing Evid. Code, § 353, subd. (a).)  In other words, because the penalty decision is normative and the prosecution need not prove that any given aggravating circumstance exists in order to obtain a death judgment (*People v. Anderson* (2001) 25 Cal.4th 543, 589 (*Anderson*)), defendant may not challenge the verdict on the ground that the prosecutor failed to prove each of the elements of an uncharged offense beyond a reasonable doubt.  His claim of error lies in the erroneous *admission* of such evidence; that claim must be preserved by a timely objection in the trial court.

*Livingston*, *supra*, 53 Cal.4th 1145, recently affirmed this principle.  There the defendant argued that his claim should not be deemed to be forfeit because "he is not challenging the *admission* of the evidence but its *sufficiency*, a challenge a defendant may make on appeal from a conviction without an objection.  But, as we explained in *Montiel*, here the evidence was admitted at the penalty phase of a capital trial as aggravating evidence, not to support a conviction for that crime."

42

(*Id*. at p. 1175.)  *Livingston* held that the defendant had "forfeited the claim the evidence should not have been admitted on the ground that it was insufficient. Defendant could, and did, argue to the jury that the evidence was insufficient. But, as *People v. Montiel*, *supra*, 5 Cal.4th 877, explains, he cannot argue on appeal the evidence should not even have been admitted without objecting on this ground at trial."  (*Ibid*.)

Defendant further argues that his challenge to the admission of the cell extractions that occurred on March 8, 1997 at High Desert State Prison, and on April 18, 2000 at Corcoran State Prison should not be deemed to be forfeit inasmuch as the court examined the admissibility of those two incidents on its own motion.  He reasons that any further objection by counsel would have been futile because the trial court had already addressed the issue and there was no reason to think that a specific objection would have resulted in a different ruling.  He cites *People v. Hill* (1998) 17 Cal.4th 800, but that case is distinguishable.  In *Hill*, defense counsel was "subjected to a constant barrage of . . . unethical conduct" by the prosecutor that the trial court failed to control.  (*Id*. at p. 821.)  The atmosphere was "so poisonous," and reflected so unfavorably on defense counsel in front of the jury, that counsel's failure to object was excused under the "unusual circumstances" of that case.  (*Ibid*.)  No similar circumstances are present here. Defendant points to no instance where the trial court precluded his counsel's objections.  On the contrary, at one point when discussing the admissibility of the aggravating evidence, the court expressly invited defense counsel's comments.

Additionally, defendant's arguments on appeal deviate from the concerns the trial court raised below.  With respect to the April 18, 2000 incident, discussed further below, the court challenged the prosecutor's representation that defendant's possession of a pepper spray canister qualified a weapon under section 4502.  It was satisfied, however, that a battery occurred when defendant snatched

the pepper spray from the guard, and made contact with his hand.  By contrast, on appeal, defendant argues that simple assault and misdemeanor battery are categorically excluded as acts of violence under section 190.3, factor (b). Regarding the March 8, 1997 incident, also discussed below, the trial court initially wondered whether the defendant's actions amounted to an assault.  It was later satisfied by the officer's explanation that defendant had rushed at the guards while holding a mattress.  On appeal, defendant argues that he charged out of the cell because the officers ordered him to come out, and that he used the mattress as a shield to defend himself from rubber bullets, not as a weapon.  Defendant offers no explanation why the trial court would have refused to consider these additional points in ruling on the admissibility of the evidence.  Accordingly, defense counsel's failure to raise them constitutes a forfeiture.

### b. The Evidence Was Properly Admitted

Although defendant's challenge was forfeited, we briefly address his claims on the merits.  " ' "[A] trial court's decision to admit 'other crimes' evidence at the penalty phase is reviewed for abuse of discretion, and no abuse of discretion will be found where, in fact, the evidence in question was legally sufficient." ' " (*People v. Tully* (2012) 54 Cal.4th 952, 1027 (*Tully*).)  No abuse of discretion appears.

### i. Incidents on March 8, 1997 at High Desert State Prison and on April 18, 2000 at Corcoran State Prison

Sergeant Dewall testified that on March 8, 1997, defendant and his cellmate covered their cell window, which prevented security checks.  Despite repeated orders from staff, the inmates refused to remove the covering.  Officers sprayed three bursts of pepper spray into the cell at two-minute intervals.  Each time the inmates were given an opportunity to comply, but refused.  The officers then fired six projectiles into the cell, again giving the inmates an opportunity to comply

between each discharge. When the cell door was opened, defendant ran into the officers as he tried to charge out holding a mattress. This evidence was sufficient to establish a battery, which "is any willful and unlawful use of force or violence upon the person of another." (§ 242.)

Lieutenant James Gatto testified that on April 18, 2000, defendant was told he would have to move to a different cell. He refused to be handcuffed, and said that he was "going to go my way." Lieutenant Gatto organized a cell extraction. He sprayed pepper spray through the food port. Defendant reached through the port and grabbed the canister, making contact with Gatto's hand. Defendant then struck the window of his cell 14 times with the large metal canister, shattering the glass. Defendant's contact with Gatto's hand as he snatched the canister constituted a battery.

Defendant argues that these incidents should not have been admitted because they "were simple assault and misdemeanor battery, not acts of violent criminality." He maintains that criminal activity should only be admissible under section 190.3, factor (b) "when the circumstances of its commission causes, threatens to cause, or is likely to cause serious bodily harm." However, we have consistently upheld admission of conduct amounting to a misdemeanor battery as a circumstance in aggravation under factor (b). (See e.g., *Tully*, *supra*, 54 Cal.4th at pp. 1027-1029 [defendant twice wrestled with other inmates and threw punches]; *People v. Thomas* (2011) 51 Cal.4th 449, 504-505 (*Thomas*) [defendant sucked on a woman's neck without permission, leaving a bruise]; *People v. Hamilton* (2009) 45 Cal.4th 863, 934 [defendant spat on a deputy]; *People v. Burgener* (2003) 29 Cal.4th 833, 868 (*Burgener*) [defendant threw water, urine, scouring powder, bleach, and other substances at correctional officers].)

Additionally, the proper admission of evidence under factor (b) is not based on the abstract, definitional nature of the offense, but on the conduct it involves.

45

(*People v. Thomas* (2011) 52 Cal.4th 336, 363.) Charging at correctional officers and attempting to bowl them over while holding a mattress as a shield constitutes a serious threat of force; so too does grabbing a large canister of pepper spray and using it to shatter the security window of a prison cell.

As to the March 8, 1997 extraction, defendant argues "[t]here was no evidence that [he] intended to make any physical contact with the guards. His 'charging' out of the cell was in response to repeated orders to exit the cell. The mattress . . . held before him was used as a shield against the rubber bullets, not as a weapon, and also prevented harm to the correctional officers by blocking contact with [defendant's] hands and feet." Defendant's claims of lawful compliance and actions in self-defense are belied by the evidence. The officers gave defendant ample opportunity to peaceably comply with their directives before resorting to pepper spray and projectiles. Given defendant's classification as a high security risk, the officers' use of nonlethal force to remove him from the cell was not excessive. At the guilt phase the jury heard defendant's statement explaining his motivation for provoking cell extractions: "things build up man, it just builds up and I just get so angry I can't control it. I try to stay away from Cell Extractions because that's the last thing I want to do is have problems with the [correctional officers] when I'm depending on them so much. But it get[s] to the point to where you know what it doesn't matter man. . . . You know so it's like I feel that I have to do something more than [arguing with or gassing[18] the guards] you know I feel that *I have to draw blood*[;] I have to do something[;] I have to *try to hurt one of them*. You know in order to feel successful." (Italics added.) "I do [cell

---

[18] "Gassing" involves intentionally throwing human excrement or bodily fluids, or a mixture containing them, that results in contact with a person's skin or membranes. (§ 4501.1, subd. (b).)

46

extractions] because that's the only opportunity which I'm gonna have physical contact with [the guards,] you know what I mean. And uh aside from wrestling I don't even, I'm not trying to wrestle with them I'm not trying to fist fight with them you know. I'm hoping that I could take out the mask, if I can get a hold of razor blade you know what I mean, or whatever I could do. *If I could bring harm to them*. And I want them to pay you know what I'm saying because they take it as a big old joke so I look like at it's like of any, any harm I could strike against them I'm up against it anyway. I can't beat whatever how many is coming in that cell, I know that. But *if I can cut one of them[,] stab one of them* whatever, however way I can, to me that's success." (Italics added.) Given defendant's own statements, his attempt to recharacterize these incidents as nonviolent attempts at peaceful compliance fail.

Under these circumstances, the trial court did not err in admitting the March 8 and April 18 incidents.

> ii. *Incidents on March 12 and 13, 1997 at High Desert State Prison and on November 13, 1999, March 29, 2000, and April 15, 2000 at Corcoran State Prison*

On March 12, 1997, defendant and his cellmate Romo obscured the window of their cell and refused to remove the covering. When Sergeant Dewall tried to look into the cell through the food port, he was struck by two small cardboard milk containers containing a yellowish-brown substance that smelled of feces and urine. The substance splashed onto his face and arm. Dewall ordered the inmates to submit to handcuffing but they refused. Early the next morning, officers performed a cell extraction. The officers sprayed pepper spray into the cell three times. Each time they directed defendant and Romo to comply with their orders, but the inmates refused. When officers fired six rubber projectiles into the cells, defendant and Romo again refused to comply. The officers forcibly

47

entered the cells; both defendant and Romo attacked them. Officer Hornbeck fell down, and defendant punched him repeatedly in the chest. On a scale of one to 10, Sergeant Dewall described defendant's aggressiveness towards the officers as a nine.

The gassing incident and the subsequent fight with a correctional officer were admissible under section 190.3, factor (b) as batteries. (*Burgener*, *supra*, 29 Cal.4th at p. 868.) Defendant argues that the gassing should not have been admitted because Dewall did not see who threw the liquid. He fails to persuade. There were only two men in the cell. Two containers were thrown at the same time. Defendant refused to comply with commands both before and after the gassing. He put up a violent struggle during the subsequent cell extraction. This evidence supported a jury finding that he was responsible for the gassing as either a direct perpetrator or as an aider and abettor. Defendant also asserts that the officers used excessive force against him, and that he acted in self-defense when punching Officer Hornbeck. The jury could have concluded otherwise, however, given defendant's stated intent to provoke cell extractions, his refusal to comply with the officer's commands, and his striking Hornbeck repeatedly in the chest as Hornbeck lay on the floor. Both incidents were properly admitted.

On November 13, 1999, Officer Jamie Tovar escorted inmate Lopez to the shower. As they passed by defendant's cell, Lopez kicked at something. Tovar saw an object protruding from defendant's food port. He pushed Lopez out of the way and kicked at the object, breaking it into two pieces. The object was a plastic spoon handle sharpened to a point and wrapped in rolled paper. During a subsequent search of defendant's cell, Officer Carlos Espinoza found a sharpened toothbrush wrapped in a paper handle. Defendant occupied the cell by himself. This evidence that defendant possessed a potentially dangerous weapon was admissible under factor (b). (*People v. Wallace* (2008) 44 Cal.4th 1032, 1081-

48

1082 (*Wallace*); *Lewis*, *supra*, 43 Cal.4th at pp. 529-530.)  Defendant argues that no witness saw him in possession of the sharpened spoon.  However, the fact that defendant was alone in the cell when the item was seen protruding from the food port was sufficient circumstantial evidence that he possessed the weapon.

On March 29, 2000, defendant was in a cell talking with Officer Kenneth Pearson.  Defendant reached out and placed a weapon on the ledge of the cell's food port.  Another officer, Francisco Mascarenas, saw the weapon and videotaped the rest of the encounter.  The tape shows the weapon sitting on the ledge.  After Pearson walks away, defendant picks up the weapon and hides it in the waistband of his boxer shorts.  Mascarenas ended the video, walked over to defendant, and told him to surrender the weapon.  Defendant threw it into a trash can.  The weapon was six inches long with a paper handle and a three-quarters' inch sharpened metal point.  This evidence that defendant possessed a potentially dangerous weapon was admissible under factor (b).  (*Wallace, supra,* 44 Cal.4th at pp. 1081-1082; *Lewis*, *supra*, 43 Cal.4th at pp. 529-530.)

Defendant maintains that this incident was unreliable because the videotape evidence contradicted Pearson's testimony that he saw defendant place what he thought was a piece of paper in the food port, and then brush it onto the floor.  This minor discrepancy is of no moment.  The videotape and Mascarenas's testimony clearly show defendant in possession of the weapon.  Defendant also argues that the weapon posed no threat of force or violence because he made no attempt to use it against Officer Pearson.  It has been established for over two decades that possession of a potentially dangerous weapon in custody "is unlawful and involves an implied threat of violence even where there is no evidence defendant used or displayed it in a provocative or threatening manner."  (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 589, disapproved on another ground in *People v. Harris* (2008) 43 Cal.4th 1269, 1311; accord, *Lewis*, *supra*, 43 Cal.4th at pp. 529-

49

530.) Notably, defendant did not surrender the weapon to Officer Pearson, but instead concealed it on his person after Pearson walked away. "The circumstances of defendant's possession of the [weapon], particularly when viewed together with his overall conduct while in custody . . . lead us to conclude that the trial court did not abuse its discretion in admitting the evidence . . . ." (*Wallace*, *supra*, 44 Cal.4th at p. 1082.)

On April 15, 2000, Officer William Henderson saw defendant standing on his bunk trying to cover the overhead light fixture with a blanket. Another correctional officer, William Butts, removed defendant from the cell and searched it. He found three metal weapons hidden under a blanket. One was a two-and-one-quarters' inch long metal stock, sharpened to a point. A second was three inches long, sharpened on one side, and fixed to a paper handle. A third was approximately five inches long, sharpened to a point, with a handle fashioned from cloth and surgical tape. Grooves had been cut into the Plexiglas light fixture and defendant's bunk. Plastic shavings on the floor appeared to have come from the light fixture. Defendant occupied the cell alone. Again, this evidence that defendant possessed potentially dangerous weapons was admissible under factor (b). (*Lewis, supra,* 43 Cal.4th at pp. 529-530.) Defendant argues there was no evidence that he knew of the weapons or had control over them. No one saw him make the weapons or place them under the blanket. However, the fact that defendant was alone in the cell with weapons hidden under his blanket and fresh shavings on the floor was sufficient circumstantial evidence of knowing possession. (See *ibid*.)

Because each of the challenged incidents was admissible under section 190.3, factor (b), defendant's further arguments that the jury considered invalid and irrelevant aggravating factors in violation of the Eighth and Fourteenth Amendments fails. (*Tully*, *supra*, 54 Cal.4th at p. 1030.)

50

### c. Sufficiency of Aggravating Evidence

Defendant further argues that, as to these seven unadjudicated aggravating circumstances, the evidence presented was legally insufficient to prove them beyond a reasonable doubt. He contends that the penalty phase determination was impermissibly skewed by the jury's consideration of numerous aggravating incidents that the prosecution ultimately failed to prove. No error appears.

"To admit evidence of unadjudicated crimes under section 190.3, factor (b) necessarily entails a risk that the evidence may not be sufficient to convince all jurors of the defendant's guilt. Yet we have described this risk as acceptable, in view of the need to place before the jury all evidence properly bearing on its capital sentencing decision, and in view of the rule that no juror may consider such evidence unless first convinced of its truth beyond a reasonable doubt. [Citation.][19] The court must give such an instruction sua sponte whenever it admits evidence under factor (b). [Citations.]" (*People v. Yeoman* (2003) 31 Cal.4th 93, 132 (*Yeoman*).)

Here, the court instructed on the elements of weapon possession by a prisoner (§ 4502, subd. (a)), assault (§ 240), and battery by a state prisoner on a nonprisoner (§ 4501.5). It further instructed on the use of lawful force by a correctional officer and on self-defense in response to excessive force. It directed that no juror could consider an uncharged criminal act in aggravation unless first convinced of its truth beyond a reasonable doubt.

Whether defendant's use of force was legally justified and the weight, if any, to be given to these incidents for purposes of the individualized penalty

---

**19**     California law requires proof beyond a reasonable doubt of other crimes evidence as "a foundational requirement—one not mandated by the Constitution." (*Anderson*, *supra*, 25 Cal.4th at p. 589.)

51

assessment were matters for the jury to decide in light of the given instructions. (*Tully*, *supra*, 54 Cal.4th at p. 1030.) "[A]ny hypothetical juror whom the prosecution's evidence might not have convinced beyond a reasonable doubt must be presumed to have followed the court's instruction to disregard the evidence." (*Yeoman*, *supra*, 31 Cal.4th at pp. 132-133.) The jury's consideration of the evidence did not violate defendant's federal constitutional rights under the Eighth or Fourteenth Amendment.

### 4. *Instruction with CALJIC No. 8.87 on the Use of Other Crimes Evidence as a Circumstance in Aggravation*

The court gave CALJIC No. 8.87, regarding the use of other criminal activity as a circumstance in aggravation under section 190.3, factor (b). That instruction, as given, referred to the other crimes committed "which involved the express or implied use of force or violence or the threat of force or violence." Defendant argues that the instruction creates an impermissible mandatory presumption by removing the force or violence requirement from the jury's determination. He further argues that the instruction erroneously fails to define that requirement. These errors, he contends, violated his state and federal constitutional rights to a jury trial and to a reliable penalty verdict determination.

As defendant acknowledges, we have repeatedly held that the trial court determines as a matter of law whether the prosecution's proposed evidence is a crime involving the use, attempt, or threat of violence. The jury determines only whether the prosecution has proved beyond a reasonable doubt that the defendant committed the unadjudicated criminal act. (*Bryant*, *supra*, 60 Cal.4th at pp. 451-452; *Streeter*, *supra*, 54 Cal.4th at p. 266; *People v. Taylor* (2010) 48 Cal.4th 574, 656 (*Taylor*); *People v. Burney* (2009) 47 Cal.4th 203, 259; *People v. Loker* (2008) 44 Cal.4th 691, 745; *People v. Monterroso* (2004) 34 Cal.4th 743, 793; *Nakahara*, *supra*, 30 Cal.4th at p. 720.)

52

Defendant urges us to reconsider this long-standing precedent. He criticizes *Nakahara* for its brief treatment of the issue. There we held that "[t]he question whether the acts occurred is certainly a factual matter for the jury, but the *characterization* of those acts as involving an express or implied use of force or violence, or the threat thereof, would be a legal matter properly decided by the court." (*Nakahara*, *supra*, 30 Cal.4th at p. 720.) Defendant argues that the force or violence requirement is a component of relevancy, first addressed by the court as a question of admissibility, but ultimately determined by the jury under Evidence Code section 403, subdivision (a)(1). He claims that *People v. Dunkle* (2005) 36 Cal.4th 861 (*Dunkle*)[20] so holds. He is wrong.

Section 190.3 defines what *type* of evidence may be admitted. It provides that evidence of the use, attempt, or threat of force or violence "may be presented" and "shall be admitted." (§ 190.3.) *People v. Phillips* (1985) 41 Cal.3d 29, held that the trial court must determine, as a question of *law*, whether unadjudicated conduct is *admissible* as meeting the statutory definition. (*Id.* at p. 72, fn. 25, citing Evid. Code, § 310.) The jury then determines whether the activity has been proven beyond a reasonable doubt. (*Phillips*, at p. 72, fn. 25, citing Evid. Code, § 312; accord, *Anderson*, *supra*, 25 Cal.4th at p. 589.)

This interpretation is consistent with our long-standing understanding of the jury's role in evaluating unadjudicated crimes as a circumstance in aggravation. At the penalty phase, the jurors must " ' "make an individualized assessment of the character and history of the defendant to determine the nature of the punishment to be imposed." ' " (*Taylor*, *supra*, 48 Cal.4th at p. 653.) "[T]he ultimate question for the sentencer is simply whether the aggravating

---

**20** *Dunkle* was disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, footnote 22.

circumstances, as defined by California's death penalty law (§ 190.3), so substantially outweigh those in mitigation as to call for the penalty of death, rather than life without parole." (*Anderson*, *supra*, 25 Cal.4th at p. 589.) "The defendant's history of criminal violence is relevant" to that issue. (*Id*. at p. 588.) We have long held, however, that the jury need not be instructed sua sponte on the elements of the unadjudicated crimes. (*Taylor*, at p. 656; *Anderson*, at pp. 587-589; *People v. Tahl* (1967) 65 Cal.2d 719, 736-738.) This is because the issue before the jury "is the appropriate penalty for the defendant's already-proven capital crimes, not whether the defendant committed the specific elements of additional criminal offenses." (*Anderson*, at p. 588.) For the same reasons, the jury need not be instructed that it must find the unadjudicated criminal offenses involved the use, attempt, or threat of force or violence before it can consider the evidence. Rather, the jury simply considers the presence or absence of such factors in determining "the weight, if any, to be given to these incidents for purposes of the individualized assessment of [defendant's] character and history." (*Tully*, *supra*, 54 Cal.4th at p. 1030.)

*Dunkle*, *supra*, 36 Cal.4th 861, stands not to the contrary. There we rejected the defendant's argument that the trial court erred in failing to define " 'express or implied threat to use force or violence' " in the context of an uncharged burglary. (*Id*. at p. 922.) We observed that the phrase "possesses a ' "common-sense core of meaning . . . that criminal juries should be capable of understanding." ' " (*Ibid*., quoting *Tuilaepa v. California*, *supra*, 512 U.S. at p. 975.) We also rejected the defendant's argument that "*the instruction on burglary for theft* improperly permitted the jury to find an aggravating factor based on an offense not involving the use or threat of force or violence against a person." (*Dunkle*, at p. 922, italics added.) We concluded that "the burglary instruction, the general section 190.3, factor (b) instruction, and CALJIC No. 8.87 adequately

54

conveyed to the jury that before it could consider the [uncharged] incident in aggravation it had to find, beyond a reasonable doubt, all of the elements of the offense of burglary and that the offense involved the use or attempted use of force or violence, or the express or implied threat to use force or violence." (*Id*. at pp. 922-923.) We were not called upon to decide whether *CALJIC No. 8.87* was defective, as defendant here contends. Nor did we acknowledge or discuss the long line of established authority (see *ante*, at p. 52), that the trial court determines as a matter of law whether the uncharged crime involved the use, attempt, or threat of violence. "It is axiomatic, of course, that a decision does not stand for a proposition not considered by the court." (*People v. Harris* (1989) 47 Cal.3d 1047, 1071.)

Notably, CALJIC No. 8.87 did not preclude counsel from arguing against the aggravating nature of such evidence based on the surrounding facts. Counsel in fact urged the jury to find this evidence insignificant because the cell extractions were prompted by minor rules violations and no correctional officers were injured.

### 5. *Constitutionality of the Death Penalty Statute and Related Instructions*

Defendant presents a multipronged general attack on the constitutionality of California's death penalty statute and related standard jury instructions. We have previously considered and consistently rejected these challenges. We decline to revisit the following holdings:

The use of the same jury at both the guilt and penalty phases does not deprive defendant of his constitutional right to an impartial and unbiased jury under the Sixth, Eighth, and Fourteenth Amendments. (*Taylor*, *supra*, 48 Cal.4th at p. 652.)

Section 190.2 adequately narrows the class of murderers subject to the death penalty. (*People v. Rogers* (2006) 39 Cal.4th 826, 892 (*Rogers*); *People v. Jablonski* (2006) 37 Cal.4th 774, 837.)

Section 190.3, factor (a) properly allows the jury to consider the circumstances of the crime as an aggravating factor. (*Thomas*, *supra*, 51 Cal.4th at p. 506.) It is not overbroad either facially or as applied. (*People v. Robinson* (2005) 37 Cal.4th 592, 655.)

"[T]he use of unadjudicated offenses [under section 190.3, factor (b)] in capital proceedings, but not in noncapital matters, does not violate equal protection or due process principles." (*Taylor*, *supra*, 48 Cal.4th at p. 651.)

"The death penalty law is not unconstitutional for failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence." (*People v. Thornton* (2007) 41 Cal.4th 391, 469; accord, *People v. Elliot* (2005) 37 Cal.4th 453, 487-488 (*Elliot*).) Furthermore, there is no federal constitutional requirement that the jury unanimously agree on the existence of aggravating factors. (*Taylor*, *supra*, 48 Cal.4th at p. 651; *Rogers*, *supra*, 39 Cal.4th at p. 893.) The United States Supreme Court's decisions in *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, and *Apprendi v. New Jersey* (2000) 530 U.S. 466, do not compel a different conclusion. (*Taylor*, at pp. 651-652; *Rogers*, at p. 893.)

"The trial court was not required to instruct the jury that . . . the beyond-a-reasonable-doubt standard and requirement of jury unanimity do not apply to mitigating factors." (*Streeter*, *supra*, 54 Cal.4th at p. 268; accord, *Kansas v. Carr* (2016) __ U.S. __, __ [136 S.Ct. 633, 642] ["[O]ur case law does not require

capital sentencing courts 'to affirmatively inform the jury that mitigating circumstances need not be proved beyond a reasonable doubt.' "].)  Nor was it required to instruct the jury that there is a " ' "presumption of life" ' at the penalty phase."  (*Lomax*, *supra*, 49 Cal.4th at p. 595.)

"Use in the sentencing factors of such adjectives as 'extreme' (§ 190.3, factors (d), (g)) and 'substantial' (*id.*, factor (g)) does not act as a barrier to the consideration of mitigating evidence in violation of the federal Constitution." (*People v. Avila* (2006) 38 Cal.4th 491, 614-615.)

"The trial court is not required to delete inapplicable sentencing factors from CALJIC No. 8.85."  (*People v. McDowell* (2012) 54 Cal.4th 395, 444 (*McDowell*).)  Nor must the court instruct the jury that section 190.3, factors (d), (e), (f), (g), (h) and (j) are only relevant as factors in mitigation.  (*Thomas*, *supra*, 51 Cal.4th at p. 506.)

CALJIC No. 8.88 adequately informs the jury that "the central determination is whether death is the 'appropriate punishment.' "  (*McDowell*, *supra*, 54 Cal.4th at p. 444; see *Woodson v. North Carolina* (1976) 428 U.S. 280, 305.)  The instruction "properly explains to the jury that it may return a death verdict if the aggravating evidence 'warrants' death."  (*McDowell*, at p. 444.)

"The instructions were not impermissibly broad or vague in directing jurors to determine whether the aggravating factors were 'so substantial in comparison with the mitigating factors that it warrants death instead of life without parole.' [Citation.]"  (*People v. Valdez* (2012) 55 Cal.4th 82, 180.)

CALJIC No. 8.88 properly conveys to the jury that life in prison without the possibility of parole is the appropriate punishment if the factors in mitigation outweigh those in aggravation.  (*People v. Jones* (2012) 54 Cal.4th 1, 78-79.)

"The death penalty law is not unconstitutional for failing to require that the jury base any death sentence on written findings." (*Elliot*, *supra*, 37 Cal.4th at p. 488.)

"Finally, we have repeatedly held that the death penalty does not violate the Eighth Amendment to the United States Constitution or international law, including article VII of the International Covenant on Civil and Political Rights (Dec. 16, 1966). (*People v. Butler* [(2009)] 46 Cal.4th [847,] 885; *People v. Cook* [(2007)] 40 Cal.4th [1334,] 1368.) We also adhere to our conclusion that review for intercase proportionality is not constitutionally compelled. (*Pulley v. Harris* (1984) 465 U.S. 37, 42, 50-51; *People v. Williams* [(2008)] 43 Cal.4th [584,] 649; *People v. Harris* (2008) 43 Cal.4th 1269, 1322-1323.)" (*Lomax*, *supra*, 49 Cal.4th at p. 595.)

## III.  DISPOSITION

The judgment is affirmed.

**CORRIGAN, J.**


**WE CONCUR:**


**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Delgado

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S089609
**Date Filed:** February 27, 2017

_____

**Court:** Superior
**County:** Kings
**Judge:** Peter M. Schultz

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Jolie Lipsig, Deputy State Public Defender, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Ward A. Campbell, Stephanie A. Mitchell, Sean M. McCoy and Tia M. Coronado, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jolie Lipsig
Deputy State Public Defender
770 L Street, Suite 1000
Sacramento, CA  95814-3518
(916) 322-2676

Tia M. Coronado
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 324-5232