Filed 4/13/23  P. v. Cress CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E078771 |
| v. | (Super.Ct.No. RIF102042) |
| ROBERT WILLIAM CRESS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Mac R. Fisher, Judge.

Affirmed.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorneys General, and Lynne G. McGinnis and Stephanie A. Mitchell, Deputy Attorneys General, for Plaintiff and Respondent.

Petitioner Robert William Cress believed victim William Jacob had given Cress's mother AIDS. Cress and his two roommates therefore went to Jacob's home. One roommate waited in their van while Cress and the second roommate walked up to Jacob's door. Cress was holding a knife; the second roommate was holding a gun. Jacob opened the door then shut it again. The second roommate fired three shots through the door, killing Jacob.

After a trial, in which the jury was instructed on the natural and probable consequences theory, Cress was found guilty of first degree murder.

Years later, Cress petitioned to vacate the murder conviction pursuant to Penal Code section 1172.6.[1] After an evidentiary hearing, the trial court denied the petition for two reasons: First, it found Cress guilty on an aiding and abetting theory, because he acted with the intent to kill; and second, it found him guilty on a felony murder theory, because he was a major participant in the felony of attempted burglary, and he acted with reckless indifference to human life.

Cress appeals. He contends that there was insufficient evidence that he intended to kill Jacob; rather, the evidence showed that he merely intended to beat Jacob up. We

---

[1] All further statutory citations are to the Penal Code unless otherwise specified.

The petition was actually filed under former section 1170.95. (Stats. 2018, ch. 1015, § 4, amended by Stats. 2021, ch. 551, § 2.) Effective June 30, 2022, however, former section 1170.95 was renumbered as section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We will use section 1172.6, somewhat anachronistically, to refer to whichever one of the two statutes was in effect at the relevant time.

will hold that, while that is one possible view of the evidence, there was substantial evidence that Cress actually intended to kill.

He also contends that he did not have notice, as required by due process, that he could be found guilty on a felony murder theory, and that his defense counsel rendered ineffective assistance of counsel by failing to object. We will hold that defense counsel forfeited any claim of lack of notice, and that Cress has not shown that this was ineffective assistance.

I

STATEMENT OF FACTS

A.     *Preface*.

Cress and his codefendants Steven Phillips and Jose Salcido were tried together. However, Cress and Phillips had the same jury; Salcido had a different jury. Thus, some evidence was admitted at trial solely against Salcido, and not against Cress.

At the hearing on Cress's section 1172.6 petition, the prosecution introduced the entire clerk's transcript and the entire reporter's transcript. Cress did not object. Arguably, then, the trial court could consider even evidence that Cress's jury never heard. Nevertheless, we consider only the evidence that was before Cress's jury.

In accordance with the applicable standard of review (see part III, *post*), we "'must view the record in the light most favorable to the [trier of fact's finding] and give due deference to how the trier of fact may have evaluated the credibility of witnesses,

3

resolved conflicts in the evidence, and drawn reasonable inferences from the evidence.' [Citation.]" (*People v. Ramirez* (2022) 14 Cal.5th 176, 190.)

B.    *The Evidence at Trial*.

The three defendants were roommates; they lived together in Salcido's house. They also worked for the same construction company.

Ellen Shaw, Cress's mother, lived with her daughter, Meika Shaw,[2] and Meika's friend, Melissa Montanio.

In December 2001, Ellen started dating William Jacob. After about a month, they broke up. The breakup was not acrimonious; the relationship just "sort of fizzled out."

On Monday, February 18, 2002, Ellen went to a doctor. He told her he believed she had AIDS; he ran tests for sexually transmitted diseases and gave her some antibiotics.[3] She was angry at Jacob. That night, she got "[r]eally drunk." She may also have taken some sleeping pills.

Ellen went to Cress's home, crying and hysterical. She told him (in Salcido's presence) that Jacob had given her AIDS.[4] She also told him, falsely, that Jacob had

---

[2]    To avoid confusion, we refer to Ellen Shaw and Meika Shaw by their first names.

[3]    All the test results that Ellen knew about were negative; she never tried to get the results of the last test.

[4]    Ellen testified that the doctor told her that she might have a sexually transmitted disease but did not specify which. However, she also testified that the doctor specifically told her that she might have AIDS.

*[footnote continued on next page]*

impregnated her.  She said she wanted him to "kick [Jacob's] ass."  She gave him Jacob's address and directions to his house.

Cress was "real mad."  He said, "You're all my kids have.  I'm not going to let some mother fucker give you AIDS."  Ellen "expected maybe a confrontation . . . ."

About three hours later, Ellen had Meika go to defendant's house and tell him "to forget the whole thing."  Cress told Meika, "I'm not . . . gonna go do nothing."

The next day, February 19, 2002, in the afternoon and evening, Cress, Phillips, and Salcido between them drank an 18-pack of beer and a fifth of vodka.  According to Salcido, Cress and Phillips then asked him for a ride to "go beat that guy up."

Around 6:30 p.m., Cress called Montanio.  He asked whether there were any kids in Jacob's house.  She said she did not know.  He told her not to tell Ellen that he had asked the question.

Cress then called Ellen.  He was crying; he said, "I love you, mom.  Take care of my kids for me" and hung up on her.

Around 7:00 p.m., Salcido drove Cress and Phillips to Jacob's house in his van.  He later claimed he did not know anyone had a knife or gun; he was expecting "a two-on-

---

Likewise, she testified that she told Cress that Jacob had given her an unspecified sexually transmitted disease.  However, she also testified that she specifically said AIDS.

5

one fist fight."[5]  He waited in the van while Cress and Phillips walked to Jacob's house.[6]

He stayed behind because he explained, "I didn't think it was going to take three people

to beat someone up."

Cress (according to his later statement to his uncle) pounded on the door.  When

Jacob opened it, he tried to talk to him, but Jacob "slammed the door in his face."

Neighbors heard shouts of "You son of a bitch" and/or "God damn motherfucker."

Cress used a knife to cut the screen partway out of the screen door.  He then

"shattered" a bathroom window to the left of the door.  In the process, he cut his hand on

broken glass and dropped the knife inside, on the bathroom floor.  Meanwhile,[7] Phillips

fired three shots through the door, at head level.  Two of the bullets struck Jacob, one

fatally.  Unburned gunpowder particles indicated that the gun was within two feet of the

door.

Cress and Phillips got back in the van, and it "screech[ed] off."  Salcido told

police that Cress and Phillips both said "they're sorry that they capped [the] dude"

---

[5]      Salcido also testified, however, that he expected merely a one-on-one fistfight, as Phillips had asked to come along only to buy marijuana.

[6]      Salcido told police, "[T]hey got out of the car together."  He also so testified on direct.  On cross, however, he testified that Cress got out first; he (Salcido) made a U-turn and parked; and only then did Phillips get out, "to go find out what was going on."

[7]      Salcido told police, "I heard the . . . glass shatter . . . heard the . . . gunshots . . . ."  (Ellipses in original.)  At trial, he testified that he heard the gunshots before he heard the glass breaking, then that he heard the glass breaking before he heard the gunshots, and finally, that he was not sure.

(and/or sorry that they got him involved). At trial, he testified that Cress was "shaking" and "not all there," and Cress and Phillips both asked, "What happened?"

Around the time of the shooting, Montanio admitted to Ellen that Cress had asked whether there were kids at Jacob's house. As a result, Ellen went looking for Cress at his house. Finding no one there, she thought, "[H]e's maybe going after him." She then went to Jacob's house.[8] There she saw police cars. She thought, "Oh, shit, they just raised a little hell."

Meanwhile, Cress had Salcido drive the group to Cress's uncle's house. When they arrived, Phillips was holding a gun. He shouted, "I just shot a motherfucker six times and dumped him in the desert." The uncle thought Phillips was just "playing," especially after he saw that the gun was only a five-shooter. Cress told his uncle about going to Jacob's house. He was "[u]pset," "[s]cared, "[j]ittery," and "crying."

In the "wee hours" of the morning, Ellen awoke to find Cress sitting next to her. He was "scared," "crying," and "shaking."

The next morning, Cress's uncle told Cress that Jacob was dead. Cress seemed surprised. He was upset and crying. He kept saying, "It wasn't supposed to happen like this."

---

**8** Ellen claimed she was afraid that defendant would commit suicide. However, that would not explain why she went to Jacob's house.

7

Ellen, too, learned that Jacob was dead. She went to Cress's house and urged him to turn himself in. He was "hysterical," "standing over the sink, throwing up, and crying, and shaking . . . ." "[H]e was talking about killing himself."

Salcido came in, holding a pipe or a metal bar. He told Ellen and Cress's uncle "[t]o get the fuck out of there" and said to Cress, "Come on." Cress left with Salcido.

Cress's uncle contacted the police. The police found Jacob's front door and screen door locked. On February 26, the police located Cress and Phillips in Santa Clara County.

According to both Salcido and Ellen, Cress was not violent and did not carry a gun. According to his uncle, he regularly carried the knife that was found; he used it to cut drywall and in fishing. Salcido, however, testified that he did not know whether the knife was Cress's, and it was "not the kind of knife that would be used, at all, in construction[.]"

After Meika testified (reluctantly) for the prosecution and was excused subject to recall, she phoned Cress's counsel. She offered some information that she had never previously disclosed; she explained that she had been afraid of Phillips.

She then testified that, on the night of the shooting, Cress called her and asked her to come over. She arrived around midnight. Cress was "just sitting there"; he was not crying or hysterical.

Salcido told Meika that Cress got out of the van first, followed by Phillips; then Salcido saw Phillips pull out a gun. Until then, he claimed, he did not know that Phillips

8

was carrying a gun. He saw Jacob open the door, then shut it, and then he saw Phillips fire.[9]

In Meika's presence, Phillips "said to find out what hospital [Jacob] was in so he could make sure he died because he seen his face." Cress told Phillips to shut up.

## II

## STATEMENT OF THE CASE

In 2004, Cress was convicted of first degree murder. (§§ 187, subd. (a), 189.) The jury was instructed on first degree murder on a deliberation and premeditation theory and on a natural and probable consequences theory.

In 2021, Cress filed a petition to vacate the murder conviction pursuant to section 1172.6. After considering the clerk's transcript, the reporter's transcript, and argument, the trial court found beyond a reasonable doubt that (1) Cress had the intent to kill when he aided and abetted the murder and, alternatively, (2) he was a major participant in the underlying felony of attempted burglary, and he acted with reckless indifference to human life. It therefore denied the petition. (See §§ 189, subd. (e)(2), 1172.6, subd. (d)(3).)

## III

## EVIDENCE OF INTENT TO KILL

Petitioner contends that there was insufficient evidence that he aided and abetted the murder with the intent to kill.

---

[9] Salcido denied making these statements.

9

Effective January 1, 2019, the Legislature eliminated the natural and probable consequences rule as applied to murder. It also restricted the scope of the felony murder rule. (Stats. 2018, ch. 1015.)

Specifically, it amended section 188, concerning malice, so as to provide that, except as permitted by the felony murder rule, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

It also amended section 189, concerning the degrees of murder, so as to provide that the felony murder rule (§ 188, subd. (a)) applies to a person only if:

"(1) The person was the actual killer.

"(2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.

"(3) *The person was a major participant in the underlying felony and acted with reckless indifference to human life . . . .*

"[ (4) T]he victim is a peace officer who was killed while in the course of the peace officer's duties, where the defendant knew or reasonably should have known that the victim was a peace officer engaged in the performance of the peace officer's duties." (§ 189, subds. (e), (f), italics added.)

Under section 1172.6, the trial court must vacate a murder conviction that was based on a natural and probable consequences theory, unless it finds, beyond a reasonable

doubt, that the petitioner could still be convicted of murder. (§ 1172.6, subd. (d)(3).) An aider and abettor who was not the actual killer can still be convicted of murder if he or she acted with malice aforethought. (§ 188, subd. (a)(3).)

Malice may be express or implied. (§ 188, subds. (a)(1), (a)(2).) "[E]xpress malice requires an intent to kill." (*People v. Delgado* (2017) 2 Cal.5th 544, 571.) Implied malice requires "an 'intent to do an act dangerous to human life with conscious disregard of its danger.' [Citation.]" (*People v. Landry* (2016) 2 Cal.5th 52, 96.) However, even aside from the fact that Cress could not have been convicted of *first degree* murder based on implied malice (at least, not at trial),[10] here the prosecution argued below that he was guilty based on intent to kill, and the trial court found him guilty based on intent to kill.

"We review the trial judge's fact finding for substantial evidence. [Citation.] We "'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt."' [Citation.]" (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.)

---

[10]    The wording of section 1172.6 is somewhat ambiguous on this point. It could be read as saying that a *first degree* murder conviction may stand as long as the trial court finds the petitioner guilty of *second degree* murder. (§ 1172.6, subds. (a)(3), (d)(3).)

11

"Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime. [Citations.]" (*People v. Canizales* (2019) 7 Cal.5th 591, 602.)

Here, Cress had a motive to kill Jacob. He believed that Jacob had given his mother AIDS — a stigmatizing, incurable, and potentially fatal disease. She was drunk and distraught. She said she wanted him to "kick [Jacob's] ass." She gave him Jacob's address and directions to his house. He responded, "You're all my kids have. I'm not going to let some mother fucker give you AIDS[.]" However, this motive, standing alone, is not sufficient to show that Cress intended to kill Jacob, rather than to beat him up.

But there was more. About half an hour before the shooting, Cress asked if there were any children in Jacob's house. A beating would not be likely to endanger any children in the house, but a shooting might. Also, a person planning a beating would be more concerned about whether there were other adults in the house who might come to Jacob's aid. Cress's concern about children suggests an attack with overwhelming force.

Cress brought along a knife — a deadly weapon. As the trial court observed, "Why in the world does somebody arm himself with a dangerous weapon to go beat somebody up?" Moreover, he was holding it in his hand outside Jacob's door. Salcido testified that he did not recognize the knife as one that Cress regularly carried, and that the knife was useless for construction purposes. This shows intent to kill, not merely to engage in a fistfight.

12

Cress argues that he only used the knife to cut the screen door, and that this is consistent with intent to assault. However, a knife is an unlikely implement to bring along to gain entry to a house. Cress knocked on the door, and Jacob answered it; evidently, this was how he originally intended to gain entry. Only after Jacob slammed the door again did Cress, in frustration, try to cut his way in, and even then, he had no success. The most reasonable inference is that he brought the knife primarily as a deadly weapon, not as a means to gain entry.

Moreover, Phillips brought along a gun. If Cress had told him the plan was to beat Jacob up, why would he bring a gun? Perhaps for self-defense, in case Jacob got the upper hand — but then why would he fire as soon as Jacob closed the door? Rather, it is inferable from Phillips's actions that he and defendant had discussed and planned a killing. That is not the only inference — it is possible that Phillips went rogue — but because it is a reasonable inference, we must draw it.

It is also inferable that Cress knew that Phillips had a gun. Salcido told Meika that he saw Phillips, walking behind Cress, pull out a gun. Cress and Phillips then stood together outside Jacob's door. It is reasonably inferable that, at that point, Cress could see the gun in Phillips's hand.

It is significant that, as far as the evidence shows, Jacob had no idea that Ellen was claiming that he had given her AIDS. As far as he knew, his breakup with her had been amicable. If he opened his door and saw Cress and Phillips standing there, unarmed, he had no reason to fear. In fact, however, he slammed the door shut again and locked it. It

13

is reasonably inferable that he saw the gun. If so, then Cress could see it, too. Moreover, Phillips fired immediately, hitting Jacob as he was still behind the door. This confirms Salcido's testimony that the gun was already in Phillips's hand.[11]

In Cress's direct appeal, we said the fact that Cress "knew Phillips had a gun when Phillips got into Salcido's van . . . was an inference the jury could reasonably derive from the evidence presented." This is now law of the case.[12]

Moreover, Salcido waited in the car. As the prosecutor argued at trial, if the plan was to beat Jacob up, one would expect all three attackers to go to his house together. "They don't know Bill Jacob. What if he is a big guy? What if he comes to the door with a bat? Right? You're going to leave one of your backups in the car if it's just a fight? No." Rather, the attackers believed that, because they were armed, they were more than a match for Jacob; it was more important to leave one person in the van, so they could make a quick getaway. The trial court said it was "not going to put a lot of

---

[11]    Cress claims "the trial court acknowledged that 'there's no evidence that Mr. Cress knew [Phillips] was carrying a gun.'" Actually, the trial court merely acknowledged that there was an "*argument* . . . that there's no evidence that Mr. Cress knew [Phillips] was carrying a gun." (Italics added.) It also said, "I don't know for an absolute certainty whether or not Mr. Cress knew about the gun." However, it did not need to find this fact with "absolute certainty" in order to take it into consideration.

[12]    It is not dispositive of intent to kill, because, in context, we may just have meant that Cress's knowledge of Phillips's gun was evidence that murder was a natural and probable consequence. However, it is dispositive of the sufficiency of the evidence that Cress knew that Phillips had a gun.

14

weight on" this argument, but it agreed that "it's a logical argument," and implicitly it *did* put *some* weight on it.[13]

Admittedly, the evidence that, after the killing, Cress was crying, shaking, and vomiting was somewhat exculpatory. Supposedly, he said, "It wasn't supposed to happen like this." However, this evidence came from his mother and his uncle. By contrast, his sister testified that, as of midnight, Cress was "just sitting there"; he was not crying or hysterical. As Cress's mother, uncle, and sister all had a motive to try to exonerate him, the trial court could reasonably find that his sister's damaging admission was more credible. In any event, Cress could well have had the intent to kill, even assuming he had "buyer's remorse" after the killing.

At oral argument, Cress's counsel pointed out that other inferences are possible. For example, perhaps Jacob was afraid of Cress and Phillips, not because he saw a gun, but because he knew Ellen had accused him of giving her AIDS. And perhaps Jacob slammed the door, again, not because he saw a gun, but because Cress and Phillips were yelling, "You son of a bitch" and "God damn motherfucker." Nevertheless, the inferences we suggest above are reasonable. Moreover, they are mutually reinforcing;

---

[13] Unlike the trial court, we do not rely on the fact that Cress supposedly said, "We capped the dude." It found that that "is not a regretful denial of what happened but, rather, an affirmative statement that he got what he got because he deserved it."

Apparently, it got this wording from our opinion in Cress's direct appeal, in which we abbreviated the statement as simply, "[We] capped the dude." Actually, Cress said either that he was "sorry that they capped [the] dude" or sorry that he got Salcido involved. Thus, the full statement does show some regret.

15

the single hypothesis that Cress had the intent to kill explains all of the circumstances. "'[T]he principle of Occam's razor — that the simplest of competing theories should be preferred over more complex and subtle ones — is as valid juridically as it is scientifically.' [Citation.]" (*Brodie v. Workers' Comp. Appeals Bd.* (2007) 40 Cal.4th 1313, 1328, fn. 10.)

We therefore conclude that the trial court's finding of intent to kill was supported by substantial evidence.

IV

RELIANCE ON A FELONY MURDER THEORY

Cress contends that the trial court erred by finding him guilty on a felony murder theory because he did not have notice that he could be found guilty on this theory. The People respond that defense counsel forfeited this contention by failing to object. Cress therefore also contends that defense counsel's failure to object constituted ineffective assistance of counsel.

We agree that defense counsel forfeited this contention.

At the hearing on the petition, the trial court asked the prosecutor, "Under the [f]elony [m]urder [r]ule, though the intent may have been to assault, use of the knife to break into the house, is that an attempted burglary?" The prosecutor agreed. It then asked, "Why wouldn't it be the [f]elony [m]urder [r]ule then?" The prosecutor responded, "[H]ow did I miss that? I don't know. But that is true." Defense counsel did

16

not object.  Moreover, when the trial court found Cress guilty under the felony murder rule, defense counsel again did not object.

"It is well-established that a lack of notice can be forfeited by failure to object, even when it is claimed that it violated due process.  [Citation.]"  (*People v. Nguyen* (2017) 18 Cal.App.5th 260, 271.)  In particular, a defendant forfeits a claim of lack of notice of a prosecution theory by failing to object at trial.  (*People v. Abilez* (2007) 41 Cal.4th 472, 521, fn. 12.)

Cress does not argue that the prosecution was limited to those theories on which the jury was instructed at trial.  We find no such limitation in the wording of section 1172.6.  (See § 1172.6, subd. (d)(3) ["the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law"].)  Allowing a new theory is consistent with the fact that the trial court must completely reevaluate the petitioner's guilt.

Cress also does not challenge the sufficiency of the evidence that he was a major participant in the attempted burglary and acted with reckless indifference to human life.  And he does not dispute that a felony murder conviction can be based on a burglary or attempted burglary, even when the felony underlying the burglary is an assault on the victim.  (§ 189, subd. (a); *People v. Farley* (2009) 46 Cal.4th 1053, 1117-1120.)

At oral argument, counsel for Cress argued that the trial court found only "intent to assault," not specifically to commit *aggravated* assault.  Simple assault is a misdemeanor (§ 241, subd. (a)); thus an entry into a house with the intent to commit

17

simple assault would not be burglary. (See § 459.) However, "[a]bsent evidence to the contrary, we presume that the trial court knew the law and followed it. [Citations.]" (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042.) The trial court did not specify *either* simple assault *or* aggravated assault; presumably, then, it had aggravated assault in mind. Certainly Cress arming himself with a knife and knowing (as discussed in part III, *ante*) that Phillips had a gun was sufficient evidence of the intent to commit assault with a deadly weapon and/or a firearm, both wobblers. (§ 245, subds. (a)(1), (a)(2); see *People v. Farley*, *supra*, 46 Cal.4th at pp. 1112-1113 [intent to commit a wobbler supports burglary conviction].)

We therefore turn to Cress's claim of ineffective assistance of counsel.

"To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' [Citation.] To make out an ineffective assistance claim on the basis of the trial record, the defendant must show '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.' [Citation.]" (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.)

18

We cannot say there could be no satisfactory explanation for defense counsel's failure to object. Had she objected, the trial court could have continued the hearing to allow Cress to present new evidence and argument in response. Indeed, Cress argues that counsel was ineffective not only because she failed to object, but also because she failed to request such a continuance. As far as the record shows, however, there was no additional evidence and there were no additional arguments. Defense counsel did argue that the evidence showed neither an intent to enter the house nor reckless indifference to human life, but to no avail.

For much the same reason, Cress has not shown prejudice. As far as the record shows, if defense counsel had objected and/or requested a continuance, eventually the trial court would have made the same finding based on the same evidence and arguments.

Cress asserts: "[T]his Court cannot conclude a different outcome is not reasonably probable because it does not know what appellant would have argued or what evidence he would have presented had his counsel requested and been given an opportunity to do so." However, it is his burden to show prejudice. On a silent record, he cannot do so.

## V

## DISPOSITION

The order appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

CODRINGTON
J.

RAPHAEL
J.