Filed 8/25/25  P. v. Williams CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B336210 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA504700) |
| v. | |
| KWAME WILLIAMS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark Hanasono, Judge.  Affirmed.

Sarah S. Sanger, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri, Yun K. Lee and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Defendant Kwame Williams argues his trial attorney rendered ineffective assistance of counsel by failing to object to the scientific reliability of testimony by an expert firearm witness who linked cartridge cases recovered from the scene of two shootings in which Williams was charged with attempted murder. Williams bears the burden of showing his attorney acted unreasonably by failing to seek to exclude the testimony (see *People v. Delgado* (2017) 2 Cal.5th 544, 559), and on the record before us, he cannot meet his burden. Because Williams did not challenge the expert's testimony at trial on the grounds he now advances, there is little evidence in the record by which we can evaluate the propriety of the expert's methods or the soundness of his conclusions. In addition, Williams has failed to show that he was prejudiced, in that he has not shown a reasonable probability of a better outcome in his trial if his attorney had challenged the expert's testimony. We therefore affirm his convictions.

## FACTUAL BACKGROUND AND PRIOR PROCEEDINGS

The People charged Williams with four felony counts based on three separate incidents. They accused him of two counts of attempted murder (Pen. Code,[1] §§ 187, subd. (a), 664) for shooting at the driver of a vehicle near Fifth and Hill Streets in downtown Los Angeles on January 10, 2022 (count 1), and for shooting at an alleged gang rival 12 days later outside a dollar store in South Los Angeles (count 2); and two counts of robbery

---

[1] Unless otherwise specified, subsequent statutory references are to the Penal Code.

2

(§ 211; counts 4 and 5)[2] for robbing a convenience store in Inglewood on July 26, 2021.

The jury acquitted Williams on count 1 but convicted him on the three remaining counts. The jury found true a great bodily injury allegation (§ 12022.7, subd. (a)) on count 2, as well as firearm allegations (§ 12022.5, subd. (a)) on all three convictions. The trial court sentenced him to 20 years to life for attempted murder and 17 years four months for the robberies.

Because this appeal concerns only the attempted murder conviction (count 2), we focus on the facts of that offense, describing the other charges only as necessary to elucidate the issues Williams raises.

Surveillance video footage showed a white Volkswagen enter the dollar store parking lot late in the afternoon of January 22, 2022. The car had a black roof, tinted windows, low-profile tires with custom rims, a white driver's side mirror, and a black passenger's side mirror. A witness to the shooting testified that the car had Nevada license plates. Four men got out of the car and walked toward the store's entrance. One of the men wore all black. Another wore a dark gray hoodie. The third wore a black hoodie with a large white Nike emblem, and the fourth wore a white or light gray hoodie. As he reached the door, the man in dark gray appeared to notice another car nearby, where a 15-year-old boy named K.B. was seated in the passenger seat. The man pointed a gun at the windshield of the car, and K.B. got out of the vehicle. The man in gray and the man in the black Nike hoodie began firing at K.B. K.B. fled into a nearby flower

---

[2] Count 3 was dismissed before trial and is not relevant to this appeal.

3

shop, and the men got back into the Volkswagen and drove away. K.B. survived but was wounded in his legs, chest, and arm. He testified that he did not see who shot him.

The surveillance videos did not show the perpetrators' faces clearly, but a police officer who had encountered Williams several times identified him as the man in the black Nike hoodie based on his height, weight, gait, and mannerisms. In the same manner, he identified the man in the gray hoodie as Devin Washington. According to the officer, Williams and Washington were both members of the Van Ness Gangster Brims street gang. An officer who spoke with K.B. after the shooting testified that K.B. told him that he believed the shooters were asking him what gang he was from before they shot him. K.B. told the officer he was not a member of any gang, but another officer who had encountered K.B. numerous times testified that he believed K.B. was a member of the Rollin' 40's gang. The Rollin' 40's, who are affiliated with the Crips, are a rival of the Brims, a Bloods gang.

At around 2:00 a.m. on February 10, 2022, about three weeks after the shooting, sheriff's deputies stopped Williams as he was driving a white Volkswagen with Nevada license plates and a black passenger's side mirror, and with unique stitching on the leather seats. Williams claimed the car belonged to his uncle.

The prosecution produced evidence of social media posts from around the time of the shooting. In two of the videos, which were posted within one hour of the shooting, Williams was wearing a black hoodie with a white Nike logo, and was seated in a Volkswagen with distinctive stitching on the seats beside someone in a white or light gray hoodie like that worn by one of the men in the surveillance videos. Cell phone records showed that Williams's and Washington's phones were both located near

4

the corner of Century Boulevard and Prairie Avenue at 4:24 p.m., about 25 minutes before the shooting. There was no cell site data on Williams's phone for the next hour and a half, indicating the phone was not used to make or receive calls or to send or receive certain text messages during that time. Washington's phone, however, produced more granular data, allowing its location to be tracked regardless of whether it was in active use. The records showed Washington's phone traveled north and arrived near the dollar store at 4:48 p.m., just before the shooting.

Officers recovered cartridge cases from the dollar store, as well as from the scene of the alleged shooting at Fifth and Hill Streets downtown, and two more cartridge cases from the inside of the windshield of a BMW driven by Demoraey Herron, another member of the Brims who police believed had been involved in the downtown shooting. One of the officers investigating the dollar store shooting received notifications from the National Integrated Ballistics Information Network (NIBIN) suggesting that the firearms used in the dollar store shooting were linked to those used in the downtown shooting, and to one of the cases recovered from the search of Herron's BMW.

Srinivasan Rathinam, a firearms examiner for the Los Angeles Police Department, investigated the cartridge cases further. Rathinam testified that when a gun is fired, different parts of the gun leave distinctive marks on the cartridge, known as toolmarks. "By examining those marks, we can tell whether a particular cartridge case [was] fired in a specific firearm or not." According to Rathinam, his work is independently verified by a second examiner, as well as a tech reviewer who tests the validity of the photos used in the review. Rathinam testified that his work is more thorough than that produced by NIBIN, which only

flags possible matches.  Rathinam looks at cartridge cases under a microscope to reach a more specific conclusion.

Rathinam concluded that six of the cartridge cases recovered from the scene of the dollar store shooting came from one weapon, which he labeled 1-A, and the other four came from a different weapon, 1-B.  In addition, Rathinam concluded that the two cases recovered from the scene of the downtown Los Angeles shooting were fired from the same weapon as the 1-B cases, and that one of the two cases from the traffic stop of Herron came from the same weapon as the 1-A cases.

On cross-examination, Williams's attorney challenged Rathinam's conclusions, suggesting that ballistics is not "an exact science" and that "[s]omeone else could examine the same evidence and reach a different conclusion; correct?"  Rathinam replied, "Reproducibility is the hallmark of science.  Reproducibility is established within this science.  There is subjectivity involved.  That doesn't mean there is no reproducibility.  Meaning, the error rates are extremely low, like 1 percent or 2 percent, depending on how you define the error rates."  Williams's attorney did not press Rathinam further on this point, asking him instead whether he was given the firearms to examine, and whether the cartridge cases from the traffic stop of Herron came from separate guns.

## DISCUSSION

Williams contends his attorney rendered ineffective assistance by failing to object to Rathinam's testimony.  To establish a claim of ineffective assistance of counsel, "the defendant must show [both] that counsel's representation fell below an objective standard of reasonableness" (*Strickland v. Washington* (1984) 466 U.S. 668, 688 [104 S.Ct. 2052, 80 L.Ed.2d

6

674]), and "that the deficient performance prejudiced the defense" (*id.* at p. 687). Williams has done neither. He claims that expert toolmark testimony is "scientifically invalid and inadmissible," but he has cited no case law deeming such testimony generally inadmissible. Nor does the record include information that would allow us to evaluate the level of acceptance of toolmark analysis in the scientific community. In addition, Rathinam's testimony appears not to have contributed significantly to the jury's verdict. The testimony claimed to establish a link between the guns used in the dollar store shooting and those used in the downtown shooting, but there was no physical evidence connecting Williams to any specific weapon, and the jury acquitted Williams of attempted murder in the downtown shooting.

In support of his claim that his attorney was deficient for failing to object to Rathinam's testimony, Williams relies primarily on *People v. Azcona* (2020) 58 Cal.App.5th 504 (*Azcona*). In that case, the defendant committed three separate shootings, and the prosecution relied on testimony from a firearm expert to show that casings from two of the shootings came from the same gun. (*Id.* at pp. 509-510.) On appeal, the defendant argued that the validity of toolmark analysis had been "recently undermined to such a degree that it is no longer admissible" (*id.* at p. 511, italics omitted) under the standard established by *People v. Kelly* (1976) 17 Cal.3d 24, which provides that "[e]xpert testimony based on the application of a scientific technique is admissible in California if the technique is generally accepted in the pertinent scientific community." (*Azcona, supra*, at p. 510, citing *Kelly, supra*, at p. 32.)

At a hearing on the defendant's motion in limine seeking to exclude the evidence, the defendant in *Azcona* "called as a

witness a research scientist trained in assessing the foundational validity of scientific techniques generally.  The scientist opined that the method of visual toolmark comparison employed by the prosecution expert is unreliable; in his opinion, 'there is no good evidence yet that the [method] will arrive at the correct answers.'  He testified extensively about three scientific reports—two produced by the National Academy of Sciences in 2008 and 2009, and another similar study from 2016.  Those reports sharply criticize visual analysis of firearm toolmarks as an unreliable method, not tethered to objective standards and without a measurable error rate."  (*Azcona*, *supra*, 58 Cal.App.5th at p. 512.)

The court was skeptical as to whether the *Kelly* standard should be applied to toolmark analysis at all, "as visual comparison of marks on physical objects is not so foreign to everyday experience that jurors would have unusual difficulty evaluating it."  (*Azcona*, *supra*, 58 Cal.App.5th at p. 511.)  To the extent *Kelly* principles applied, however, the court stated that it "cannot find the [toolmark comparison] method categorically inadmissible here because [the] defendant did not meet his burden to show that a clear majority of the relevant scientific community no longer accepts the method as reliable."  (*Azcona*, *supra*, at p. 512.)

Nevertheless, the court held that the trial court erred by failing to "act as a gatekeeper to ensure the opinions offered by an expert are not 'based on reasons unsupported by the material on which the expert relies.' "  (*Azcona*, *supra*, 58 Cal.App.5th at p. 513, quoting *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771; see also Evid. Code, §§ 801, subd. (b), 802.)  The certainty of the expert's testimony "that the

8

matching marks on the relevant projectiles are 'much more than can ever happen by random chance,' and therefore the projectiles came from the same gun, 'to the practical exclusion of all other guns' " (*Azcona, supra*, at pp. 513-514), was "a leap too far from what the underlying method allowed. There was support for the opinion that the projectiles likely came from the same gun, perhaps more likely than not, but there was no basis to present it as a scientific certainty. The trial court abused its discretion by failing to limit the expert's opinion to what was actually supported by the material the expert relied on." (*Id.* at p. 514.)

Williams argues that Rathinam's testimony was just as flawed as the expert testimony in *Azcona*, and that an objection from his attorney would have prevented Rathinam from drawing "a purportedly infallible conclusion" from the toolmark data. (*Azcona, supra*, 58 Cal.App.5th at p. 514.) But *Azcona* did not purport to state a general rule on the admissibility of toolmark testimony. The toolmark issue was fully litigated before the trial court in that case, and the court's decision relied on the testimony of a defense expert who cited three scientific reports on the use of toolmark analysis. Because Williams's attorney did not object to Rathinam's testimony, we have nothing like the same record in this case. We do not know whether Rathinam employed the same methods as the prosecution expert in *Azcona*, and we have no complete picture of how views of toolmark analysis have evolved in the scientific community in the four years since *Azcona*.[3] The

_____

[3] Williams asks us to take judicial notice of an amicus brief filed in another case by the Wilson Center for Science and Justice at Duke Law School. (Available at <https://wcsj.law.duke.edu/wp-

*Azcona* court suggested the differences in toolmarks from one bullet to another are visible even to nonexperts, but as far as we can see, the appellate record does not contain any photos of the cartridge cases at issue in this case. We are simply not equipped to act as a factfinder on the basis of an incomplete record.

In short, the record is devoid of the evidence we would need to judge whether Williams's attorney acted reasonably in deciding not to challenge Rathinam's testimony. "It is [the] defendant's burden to show that counsel performed deficiently . . . ." (*People v. Delgado*, *supra*, 2 Cal.5th at p. 559.) Williams has not met that burden.

Williams's claim of ineffective assistance also fails because he has not shown that his attorney's failure to object prejudiced

---

content/uploads/2024/05/2024.05.14-Amicus-Brief.pdf> [as of Aug. 25, 2025].) "While we may take judicial notice of court records and official acts of state agencies (Evid. Code, § 452, subds. (c), (d)), the truth of matters asserted in such documents is not subject to judicial notice." (*Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482.) The amicus brief contains information not presented to the trial court and we cannot determine if the "[f]acts and propositions that [it contains] are not reasonably subject to dispute . . . ." (Evid. Code, § 452, subd. (h); see also *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) The brief provides additional information on studies calling into question the validity of toolmark analysis, but in the absence of testimony from a defense expert, we cannot judge to what extent the flaws identified in the studies apply to Rathinam's methods. In addition, because Williams did not object to the testimony, the prosecution had no occasion to present information supporting the accuracy of toolmark analysis, and Rathinam himself had no opportunity to explain or defend his methods.

him.  In other words, he has not "demonstrate[d] a reasonable probability that," if his attorney had challenged Rathinam, "the trial's outcome would have been more favorable."  (*People v. Delgado, supra*, 2 Cal.5th at p. 568.)  Rathinam's testimony did not connect Williams personally to the shootings.  The police did not recover any of the guns at issue, and Rathinam did not claim that any cartridge case was fired from any particular weapon.  Instead, he testified that the cartridge cases recovered from the dollar store came from two different guns—something the video surveillance already established as it showed two different individuals firing guns at the victim.  One of those guns was also used in the downtown shooting, and the second gun produced a casing found in Herron's BMW.  That BMW was suspected of being involved in the downtown shooting but was not seen in the parking lot of the dollar store.

The jury appears to have found the evidence of a link between the two shootings less than fully persuasive because it acquitted Williams of attempted murder in the downtown shooting while convicting him of the shooting at the dollar store.  This does not imply that Rathinam's testimony had no impact on the verdict in the dollar store shooting, but it does suggest the jury relied principally on other evidence in convicting Williams of the attempted murder of K.B.  This included the officer's identification of Williams in surveillance video footage, the presence of Williams's white Volkswagen in the parking lot, and the social media postings within an hour of the shooting showing Williams in that same Volkswagen wearing a hoodie identical to the one seen in the surveillance video.  In light of this evidence, which tied Williams much more closely to the shooting than did the toolmark testimony, it is not reasonably probable that

11

Williams would have obtained a more favorable result if Rathinam's testimony had been excluded.

## DISPOSITION

The judgment of the trial court is affirmed.

NOT TO BE PUBLISHED


WEINGART, J.


We concur:



BENDIX, Acting P. J.



M. KIM, J.